**MAGNOLIA HOMES MANUFACTUR-ING CORPORATION, a Mississippi Corporation, Plaintiff-Appellant,**

v.

**Joel A. MONTGOMERY, Defendant-Appellee.**

**No. 71-1090.**

United States Court of Appeals, Eighth Circuit.

Dec. 8, 1971.

Jacob K. Stein, Leonard S. Meranus, Thomas B. Brush, Paul M. Schindler, Paxton & Seasongood, Cincinnati, Ohio, Jack O. Knehans, Finch, Finch, Knehans & Cochrane, Cape Girardeau, Mo., for plaintiff-appellant.

Bernard C. Rice, Blanton, Blanton, Rice & Sickal, Sikeston, Mo., for defendant-appellee.

Before VAN OOSTERHOUT, HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This is a diversity action on a promissory note brought by Magnolia Homes Manufacturing Corporation (Magnolia), a Mississippi corporation, having its principal place of business in Mississippi, against Joel A. Montgomery (Montgomery), a resident of Sikeston, Missouri. G. & M. Corporation (G&M), an Alabama corporation, and Bill Glascock (Glascock), an Alabama resident, were also named as defendants in the action, but were not served and are not involved in this appeal. The district court appointed a Special Master, who took evidence, made findings of fact and conclusions of law, and recommended a decision which was adopted by the district court. On this appeal by Magnolia, we

modify and affirm the decision of the district court.

The note in question was executed in Vicksburg, Mississippi on September 14, 1966, in the principal amount of $350,000.00, with interest at 6% per annum. It was made payable to Magnolia and signed on behalf of G&M by Glascock as president. Glascock and Montgomery signed individually as "guarantors." The note was payable in thirty monthly installments of principal and interest, of $12,592.65 each, with the first installment due October 15, 1966. The note provides that: "For value received the undersigned jointly and severally promise to pay to the order of Magnolia Homes Manufacturing Corporation three hundred fifty thousand dollars * * * ". It also provides that:

"If any installment of this note is not paid at the time and place specified, the entire amount unpaid shall become due and payable at the election of the holder hereof. All parties hereto, whether makers, endorsers, sureties, guarantors, or otherwise, hereby waive presentment, demand, notice of demand, nonpayment and protest. If this note is placed in the hands of an attorney for collection, we jointly and severally agree to pay all attorney's fees and other costs and charges properly incurred.

*    *    *    *    *    *

"In the event of default in the payment of any installments due hereunder, the holder of the said indebtedness may at its option declare all of said indebtedness due and payable and may sell the above described property at public or private sale with the right to be the purchasers themselves at such sale at any time without advertisement or notice and after deducting all legal or other costs and expense to apply the proceeds of such

sale, including 10% attorney's fees, returning the overplus to the undersigned."

G&M, Glascock, and Montgomery pledged as security for the payment of the note 60,000 shares of the common stock of Caprice Homes Manufacturing Corporation (Caprice), an Alabama corporation, together with other common stock.[1] This 60,000 shares of Caprice was 60% of the outstanding shares of that corporation. The record is not clear whether Glascock and Montgomery owned 30,000 shares apiece or whether the Caprice stock was owned by G&M or one of the Schevelle Homes companies. G&M was owned 50% by Glascock and 50% by Montgomery. A supplemental agreement was executed by these parties on the same date as the note was executed stating that this Caprice stock was owned individually by Glascock and Montgomery.

On March 20, 1967, Glascock and Montgomery entered into a written agreement pursuant to which Glascock acquired all of Montgomery's stock ownership and interest in the Schevelle Homes companies, including the 60,000 shares of Caprice, which the agreement indicated was then owned by Schevelle Homes Corporation. Montgomery thereby divested himself of all stock ownership of Caprice and the Schevelle Homes companies in exchange for $40,000.00. In the agreement, Glascock also agreed to indemnify Montgomery and hold him harmless from any present or future obligations which might arise out of the fact that Montgomery "had personally signed or guaranteed corporate obligations. * * * "

Thirteen monthly installment payments of $12,592.65 each were made from October 15, 1966, to October 15, 1967, although the last of those payments were late and involved an insuffi-

1. The other common stock pledged was stock owned by Glascock in four different "Schevelle Homes" companies, together with stock in the same four companies which G&M was purchasing from Magnolia with the $350,000.00 note and $100,-

000.00 in cash. The four Schevelle Homes companies later became insolvent and G&M's only assets were the stock in these Schevelle Homes companies and possibly the stock in Caprice. Glascock later took bankruptcy.

cient fund check which was later made good. By this time, however, the Schevelle Homes companies were in precarious financial condition. Glascock was also president and chief executive officer of Caprice, which, as did Schevelle, manufactured mobile homes. Caprice was in financial difficulties and asked Magnolia for financial assistance. Magnolia personnel inspected the Caprice plant and investigated its financial situation.

On or about November 13, 1967, F. L. Cappaert, who was president of Magnolia, authorized his assistant, Mildred Johnson, to negotiate on behalf of Magnolia Trailer Employees Profit Sharing Trust (Magnolia Trust) with Caprice for the purchase by Magnolia Trust of the land, buildings, and manufacturing machinery owned by Caprice. This apparently was necessary to prevent Caprice from closing its doors because of nonpayment of its current liabilities. On November 13, 1967, an informal agreement was signed whereby these assets were sold by Caprice to Magnolia Trust for $150,000.00 with a lease back and option to purchase. $50,000.00 of the $150,000.00 was paid to Caprice on November 14, 1967, and as a part of this transaction, Magnolia required Caprice to loan the $50,000.00 to Glascock, which Glascock in turn paid on November 17, 1967, to Magnolia on the $350,000.00 note. By agreement of Glascock and Magnolia, this payment was applied on the back end of the note. This left the note in default because the November 15, 1967, payment of $12,592.65 had not been paid. In consideration of the $50,000.00 payment, Magnolia released to Glascock all of the shares of stock of Caprice which had been pledged as collateral security for the repayment of the $350,000.00 note. Magnolia then notified Montgomery that the note was in default, and when Montgomery did not pay the balance due, this action was commenced.

Subsequent to November 1967, Magnolia Trust sold the assets, which it had purchased from Caprice, to Redman Industries (Redman) for $165,000.00. Caprice then sold all of its other assets and liabilities to Redman for $90,000.00. These other assets and liabilities were found by the Master to be worth about the same on November 15, 1967, as they were when they were sold to Redman.

The Special Master found that the value of the 60,000 shares (60%) of the Caprice stock released by Magnolia to Glascock on November 17, 1967, was $144,000.00. He arrived at that figure by determining from the evidence that the value of all the assets of Caprice minus its liabilities was $240,000.00. This was made up of the $150,000.00 paid by Magnolia Trust for some of the assets and the $90,000.00 paid by Redman later for the balance of the assets and liabilities. By applying the 60% factor to $240,000.00, the $144,000.00 figure was reached.

The Special Master further found that the balance due on the $350,000.00 note prior to any credit for the value of the released Caprice stock was $154,738.43. The evidence is clear, however, that Magnolia had credited to the note the $50,000.00 payment it received from Glascock for the release of that stock. Prior to that $50,000.00 credit, the balance due on the note had been $204,738.43. The judgment rendered in favor of Magnolia and against Montgomery by the district court (upon the recommendation of the Special Master) was $10,738.43, plus interest and attorney fees. This figure was reached by deducting the $144,000.00, which the Special Master had determined to be the value of the Caprice stock, from the $154,738.43 he found to be still due on the note.

The foregoing recitation of the facts is only a brief resume of the pertinent portions of a lengthy but inadequate record. No useful purpose would be served in reviewing the facts relating to any of the issues other than the proper credit to be given on the note as a result of the disposition of the Caprice stock by Magnolia. Suffice it to say that because of a wholly inadequate appendix

filed by the appellant, we have carefully reviewed the entire record, including the transcript of testimony at the hearing, the depositions, the pleadings, and the briefs, and have concluded that except for the question of the proper amount of the credit, the findings of fact of the Special Master were supported by the evidence and were not clearly erroneous. We are also satisfied that the conclusions of law adopted by the trial court from the report of the Special Master were correct.

■ Magnolia claims that in the absence of a finding of a lack of good faith and diligence by Magnolia in its disposition of the Caprice stock, the Special Master could not have ruled that Montgomery was damaged by the sale thereof. Montgomery claimed in his pleadings that the sale of the stock by Magnolia without Montgomery's consent relieved him of any financial responsibility on the payment of the note. The Special Master correctly concluded that under Mississippi law, which is the law of the state in which the transaction took place, that:

> "The Plaintiff Magnolia Homes discharged the Defendant Montgomery to the extent of the value of the 60,000 shares of stock of Caprice (pledged as collateral), released to the Defendant Glascock. (Miss.Code, UCC 41A:3–606)."

Section 41A:3–606, which is a part of the Uniform Commercial Code adopted by Mississippi, states in pertinent part:

> "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
>
> \*　\*　\*　\*　\*　\*
>
> (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

■ Implicit in the Special Master's conclusion is his obvious determination that Montgomery did not consent to the release of the Caprice shares to Glascock

and that the shares were unjustifiably released for less than their actual value. Both of these determinations are supported by substantial evidence in the record.

■ In the case of A to Z Rental, Inc. v. Wilson, 413 F.2d 899, 909 (10th Cir. 1969), Judge Phillips held that:

> "Where a security holder, proceeding as permitted by the security instrument, secures possession of the security and sells it at a private forced sale, he should exercise due diligence to get the best price obtainable at such a sale, and if he fails so to do and sells the security for less than he could have obtained by the exercise of such diligence, he is liable to the debtor for the difference between the price obtained and the price he could have obtained by the exercise of such diligence."

As pointed out by the appellant, that case further held that damages should not be measured by the difference between the sales price and the book value of the security. However, in the instant case, the Special Master did not use book value but used evidence of the actual sales price of all of the assets and liabilities of the corporation, and we do not feel that under the circumstances this determination was clearly erroneous. Under the terms of the note, Magnolia had a right to sell the collateral at public or private sale without notice, but under section 41A:3–606, supra, they could not dispose of the collateral at substantially less than its reasonable value without the consent of Montgomery.

■ Appellants also claim that the Special Master made a $50,000.00 mathematical error in determining the amount due, and with this contention we agree. After the October 15, 1967, payment, there remained due the sum of $204,738.43. The $50,000.00 received by Magnolia for releasing the Caprice stock was applied to this figure, reducing it to $154,738.43. The evidence was overwhelming that the $50,000.00 payment was the quid pro quo for the release of

the stock. This being true, the proper computation should have been the deduction of $144,000.00 from $204,738.43, leaving $60,738.43. The method used by the Special Master resulted in giving Montgomery credit for both the $50,000.00 payment and the full $144,000.00, which he determined to be the value of the Caprice stock.

The judgment of the trial court is modified to fix the principal amount of the judgment in favor of Magnolia and against Montgomery at $60,738.43. The trial court shall recompute the proper interest and attorney fees using that principal figure. As so modified the judgment is affirmed.