**BENEFICIAL FINANCE CO. OF NORMAN,
Appellant,**

v.

**Michael L. MARSHALL et al., Appellees.**

**No. 48265.**

Court of Appeals of Oklahoma,
Division No. 1.

Feb. 17, 1976.

Rehearing Denied April 6, 1976.

Released for Publication by Order of Court
of Appeals April 29, 1976.

Yon & Yon by Clair Yon, Oklahoma City, for appellant.

Stockwell & Pence by James E. Pence, Norman, for appellee Alva D. Garren.

BOX, Judge:

An appeal by Beneficial Finance Company, plaintiff in the trial court, from judgment entered in favor of the defendant be-

low, Alva D. Garren, in an action to recover on a note.

The payee on a note brought an action against an accommodation maker to recover the unpaid balance. The trial court held that the accommodation maker had been discharged under Section 3–606 of the Uniform Commercial Code, 12A O.S.1971, § 3–606, and under a surety exoneration statute, 15 O.S.1971, § 377, and the payee appealed. The question is whether a nonconsenting accommodation party is discharged under 12A O.S.1971, § 3–606(1)(b) when the collateral is sold by the principal debtor with the express authority of the secured creditor.

Some time in the latter part of May, 1974, Mr. and Mrs. Marshall contacted appellant Beneficial Finance Company of Norman (Beneficial) for the purpose of borrowing some money and were directed to Mr. Puckett, the office manager. After conferring with them for a few moments, Puckett reached the conclusion that the Marshalls were a bad credit risk and told them that they did not have a sufficient credit record for a loan. The Marshalls then stated that they had a friend, Doug Garren (the appellee) who would be willing to co-sign a note for them if necessary. Puckett replied that he would be glad to discuss the matter with Garren.

Shortly thereafter the Marshalls met with Garren, discussed their financial plight with him and asked him to co-sign. Garren agreed to do so and arranged a meeting with Puckett on May 29, 1974. At this meeting, Puckett told Garren that the Marshalls were a bad credit risk and advised Garren not to co-sign. Puckett's admonition did not dissuade Garren from signing a note but it did cause him to become concerned about having security for the obligation. Consequently he requested that Beneficial take a security interest in Mr. Marshall's custom built Harley Davidson motorcycle, then worth over a thousand dollars. Puckett acceded to this request and prepared a security agreement and accompanying papers for the Mar-

shall's signature. Puckett then approved a loan in the total amount of $480.00, and a note was executed by all parties. Beneficial subsequently perfected a security interest in the motorcycle by filing a financing statement in accordance with 12A O.S. 1971, § 9–401.

The controversy leading to this action began shortly after execution of the note. A week before the first monthly installment was due Garren began to suspect that default was imminent. Garren had also learned that Mr. Marshall was attempting to sell the motorcycle which had been put up for collateral and promptly went to the Beneficial office to ask for protection of the collateral. Garren discussed the matter with one of the Beneficial employees, but the substance of the discussion is not entirely clear because the trial testimony is conflicting. It is clear, at least, that Garren demanded that Beneficial do something to protect the collateral and that Beneficial refused because the Marshalls were not then in default. Puckett testified at this point that Garren "wanted me to pursue them to get it, to get the money, and I told him that was the purpose of putting him on the loan." At some point in time, either before or after the collateral had been sold, Garren also requested that Beneficial assign the security agreement to him as a condition to his payment of the debt.

Beneficial took no action until the Marshalls had defaulted on the first payment. Afterwards, on or about July 24, 1974, it notified Garren of the default and advised him that it was looking to him for complete payment. The crucial events of this case began unfolding in rapid succession thereafter. Upon learning of the default Garren sought out Mr. Marshall and demanded that he go to the Beneficial office and straighten the matter out. That same day, the 24th of July, Mr. Marshall did confer with one of the Beneficial employees as Garren had requested. *Shortly thereafter Garren received a telephone call from a Beneficial employee and was told that Mr. Marshall was going to sell the*

*motorcycle so that he could pay off the loan.*

Garren received another telephone call from Beneficial moments later and then went to the Beneficial office; when he arrived he was told that Beneficial and Mr. Marshall had reached an agreement that the motorcycle would be sold to Worthy and Sons Motor Shop. The total purchase price was about $700. Marshall was to receive $345 from Worthy and Sons immediately and promised to apply this amount to the balance due and pay the remainder from his own pocket. The motorcycle sold that day.

Later the same day Garren went to the Beneficial office and learned that Mr. Marshall had been in earlier with about $40 of the difference between the proceeds he was receiving immediately from the sale of the motorcycle and the amount due Beneficial. Beneficial had refused to accept the money until Mr. Marshall came up with the remaining portion of the balance due—an additional amount of $50. Marshall eventually returned with some more money and paid Beneficial $89.20.

Shortly thereafter Mr. Marshall telephoned Puckett and stated that he had a check in the amount of $345 to cover the remaining amount due on the note and offered to bring it to the Beneficial office. Puckett objected, however, to Mr. Marshall having possession of the money and demanded instead that Mr. Marshall direct Worthy and Sons to mail the check to his office. Puckett never received the proceeds and the record does not indicate what happened to it. Mr. Marshall left town and has not been seen since then.

Because it was unable to obtain the proceeds of the sale, Beneficial brought suit against Garren in the Small Claims Division of the District Court of Cleveland County. Garren's principal defense was that he signed the note as an accommodation party and was therefore entitled to invoke the suretyship defense of discharge under 12A O.S.1971, § 3–606(1)(b) because the collateral for the loan had been impaired. The trial court agreed and granted judgment in favor of Garren.

I.

Beneficial concedes Garren's status as an accommodation maker. It's sole contention is that notwithstanding his surety status, Garren is "absolutely liable" to Beneficial since he is a co-maker.

An accommodation party is liable "in the capacity in which he has signed." 12A O.S.1971, § 3–415 (Uniform Commercial Code citations are hereinafter cited by section only). Since Garren executed the note as a maker he was, as Beneficial urges, jointly and severally liable on the note as a co-maker. Section 3–118(e) & (f). This is settled law, see *Vinick v. Fourth National Bank of Tulsa,* 531 P.2d 327 (Okl.), but it does not resolve the instant controversy. An accommodation party possesses certain defenses not ordinarily available to the maker or indorser, which can be asserted against all but holders in due course without notice of his accommodation status. J. White and R. Summers, Uniform Commercial Code § 13–12, at page 426 (1972). The most important of these defenses are found in Section 3–606. Under Section 3–606(1)(b) the accommodation party is discharged when, without his consent, the holder "unjustifiably impairs any collateral for the instrument." The major question in this appeal is whether Garren was discharged under this section when the collateral for the loan was sold by the principal debtor with the express authority of the creditor. In order to resolve this question it is first necessary to consider the meaning of "impairment of collateral" as used in Section 3–606.

Section 3–606 does little to aid this inquiry because it does not define "impairment of collateral." Official Code Comment 5 to that section, however, states: "As to when a holder's actions in dealing with collateral may be 'unjustifiable', the section on rights and duties with respect to *collateral in the possession of a secured party* (Section 9–207) should be consulted."

12A Okl.St.Ann. § 3–606, Official Comment 5. (Emphasis supplied.)

Section 9–207, to which Comment 5 refers, deals exclusively with the conduct of a pledgee with respect to collateral in his *possession*. See generally, Comment, *Duty of Pledgee under Section 9–207*, 10 Bos. Coll.Ind. & Comm.L.Rev. 301 (1968). Subsection (1) of 9–207 provides, in part, that "[A] Secured party must use reasonable care in the custody and preservation of collateral in his possession." Does this mean that the impairment of collateral defense of Section 3–606 is available to the surety only when the holder has impaired collateral in his *possession*? Some courts, relying on the reference to Section 9–207 in Comment 5 to Section 3–606 have so stated. See, e.g., *Commerce Union Bank v. May,* 503 S.W.2d 112 (Tenn.); *First National Bank v. Helwig,* 464 S.W.2d 953 (Tex.Civ.App.); *White v. Household Finance Corp.,* 302 N.E.2d 828 (Ind.App.). See also Murray, *Secured Transactions— Defenses of Impairment and Improper Care of Collateral,* 1974 Commercial L.J. 265. We do not so interpret Section 3–606.

Admittedly at common law a duty of ordinary care was imposed exclusively upon the pledgee in possession of the security. Restatement of Security § 17 (1941). Furthermore Comment 1 to Section 9–207 makes it clear that the duty of reasonable care under this section "states the duty to preserve collateral imposed on a pledgee at common law." Nevertheless, we find no justification for interpreting Section 3–606 as reaching only a pledgee's conduct in respect to collateral. Certainly the language of Section 3–606 itself is not so limited; it refers only to the *holders* unjustifiable impairment of collateral as working a discharge of a surety. And the somewhat obscure reference in Comment 5 to Section 9–207, insofar as it appears to narrow the scope of Section 3–606 to such an extent that it embraces only the common law impairment of security, is not a binding interpretation. See generally J. White and R. Summers, supra, § 4; and

Skilton, *Some Comments on the Comments to the Uniform Commercial Code,* 1966 Wis.L.Rev. 597.

■ However, we do not read Comment 5 as a limitation upon the scope of Section 3–606. We think that Comment 5 can most properly be considered as an effort by the draftsman to explain that the term "unjustifiable" as used in Section 3–606(1)(b) means that the holder's conduct in regard to the collateral is measured by a standard of reasonable care—whether he is or is not in possession of the collateral. In our opinion such an interpretation comports with the reality of modern commercial practice; a secured party can obviously act in many ways which impair collateral not in his possession, and which result in an increase in the surety's risk. See *First National Bank v. Helwig,* supra. Moreover, there is no reason to assume, without express language to that effect, that either the legislature or the Code draftsman intended that Section 3–606 impairment defense be unavailable to the surety in such instances. We conclude therefore that the impairment of collateral defense of Section 3–606 reaches conduct by a secured party which unjustifiably impairs collateral not in his possession or control.

II.

We turn to the question of whether Beneficial impaired the collateral by authorizing its sale by the principal debtor. In order to determine this question it is necessary to consider the legal consequences of the sale with respect to the surety Garren.

■ As we noted earlier, Beneficial had a security interest in the collateral security (the motorcycle) which had been perfected by filing. Beneficial subsequently gave Marshall, the principal debtor, the express authority to sell the collateral so that it could recover the unpaid balance due on the note. By so doing Beneficial completely relinquished the security interest in the collateral. This is necessarily so because under Section 9–306(2) when the debtor

sells collateral pursuant to the authority of the creditor, the security interest is immediately cut off. See generally, R. Anderson, Uniform Commercial Code § 9–306 (1971). As a consequence Garren's right as surety to be subrogated to the security interest upon payment of Beneficial's claim was likewise destroyed. Obviously when the creditor has lost his security interest in the collateral the surety has also lost his right of recovery against the collateral—a right which more often than not prompted him to enter into the agreement in the first place.

The net result of the loss of security in this manner is that the surety's risk is greatly increased, and the law has traditionally held that conduct by the creditor which increases the surety's risk results in a discharge of the surety. Indeed, it appears to have been the common law rule that when the chattel mortgagee or other secured creditor consented to sale or disposition of the collateral, or released the collateral in some manner, the surety was discharged. See generally 15 Am.Jur.2d Chattel Mortgages §§ 151, 152 (1969); 72 C.J.S. Principal and Surety § 197 (1951); Restatement of Security § 132 (1941).

But would the creditor's consent to the sale of collateral not in his possession discharge the surety under the Uniform Commercial Code? At least one court has held that it would. *Magnolia Homes Manufacturing Corp. v. Montgomery,* 451 F.2d 934 (8th Cir.). See also *Indianapolis Morris Plan Corp. v. Karlen,* 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632; *Lafayette Bank & Trust Co. v. Silver,* 58 Misc.2d 891, 296 N.Y.S.2d 926.

It would be possible, however, to construe Section 3–606 so strictly as to exclude the authorized sale of the collateral as an impairment. Thus the term impairment is defined in Webster as follows: "The act of impairing or the state of being impaired . . . injury . . . deterioration . . . lessening." Webster's Third New Int'l Dictionary 1131 (1963). Given this definition one could view the

phrase "impairment of collateral" as referring only to affirmative acts or omissions which lessen the value of the collateral. See *Hurt v. Citizens Trust Co.,* 128 Ga. App. 224, 196 S.E.2d 349. But for the most part the courts have read a broader meaning into the phase. Thus the majority have declined to restrict the impairment of collateral defense to cases involving the diminishment of the physical value of the collateral itself and have held that the term embraces the failure to perfect a security interest in the collateral as well. *White v. Household Finance Corp.,* 302 N.E.2d 828 (Ind.App.); *First Bank and Trust Co., Palatine v. Post,* 10 Ill.App.3d 127, 293 N.E. 2d 907; *Wohlhuter v. St. Charles Lumber & Fuel Co.,* 25 Ill.App.3d 812, 323 N.E. 2d 134, 16 UCC Rep. 792; *Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc.,* 209 S.E.2d 573 (W.Va.); see also *First Citizens Bank and Trust Co. v. Larson,* 22 N.C.App. 371, 206 S.E.2d 775 (no absolute duty to perfect security interest); *Shaffer v. Davidson,* 445 P.2d 13 (Wyo.) ("collateral" within the meaning of Section 3–606 includes the security interest); Clark, *Suretyship in the UCC* 46 Tex.L.Rev. 453, 461 (1968). And it has been held that the failure of the creditor to replace a cancelled insurance policy, as it was contractually obligated to do, constituted an impairment of collateral that released an accommodation indorser. *Arlington Bank and Trust Co. v. Nowell Motors, Inc.,* 511 S.W.2d 415 (Tex.Civ.App.). The New Mexico Supreme Court, moreover, has concluded that the creditor has a comprehensive duty of care with respect to the collateral. In *American Bank of Commerce v. Covolo,* 88 N.M. 405, 540 P. 2d 1294, 117 UCC Rep. 1052, the New Mexico Court stated that "the duty imposed on a creditor under UCC § 3–606 (1)(b) encompasses the good faith obligation to exercise reasonable means to protect the rights of guarantors."

■ The one unifying conclusion that can be drawn from these cases, in our opinion, is that Section 3–606(1)(b) will be

interpreted broadly to include, in addition to conduct by the creditor which diminishes the value of the collateral, unreasonable acts which make the collateral unavailable to the surety and thus increase his risk. This view seems to be in accord with both the common law of suretyship and the expectations of the parties to a suretyship agreement.

■ In the instant case the secured creditor (Beneficial) could hardly have made the collateral more unavailable to Garren, the surety. Accordingly, we hold that the sale of the collateral without Garren's express consent constituted an unjustifiable impairment of collateral within the meaning of Section 3–606, and that because the value of the collateral exceeded the value of the debt, Garren was totally discharged.

Having reached this result it is unnecessary to decide whether Garren would have been discharged under the simple contract defenses assertable by a party to the instrument against a payee-holder in due course with whom he has dealt, or under the provisions of Oklahoma's suretyship exoneration statute, 15 O.S.1971, § 377.

The judgment of the trial court is affirmed.

AFFIRMED.

REYNOLDS, P. J., and ROMANG, J., concur.