485 So.2d 1026 (1986)
John E. HUGHES, Jr.
v.
Maurice F. TYLER.
No. 55035.
Supreme Court of Mississippi.
February 26, 1986.
*1027 John E. Hughes, III, Wells, Wells, Marble & Hurst, Jackson, for appellant.
P.J. Townsend, Jr., Townsend, McWilliams & Holladay, Drew, for appellee.
Before WALKER, P.J., and HAWKINS and DAN M. LEE, JJ.
HAWKINS, Justice, for the Court:
John E. Hughes Jr., appeals from an order of the Leflore County Circuit Court dismissing Maurice F. Tyler from his obligation as surety on a promissory note held by Hughes.
The issues presented by this appeal are (1) whether Tyler, who was the original maker of the note is entitled to the protections of § 75-3-606 Miss. Code Ann.; and (2) whether Hughes by executing a partial release and subordination agreement unreasonably impaired the collateral and thereby released Tyler from his obligation on the note.
We affirm on both issues.

FACTS
On March 15, 1977, Tyler bought 1,256 acres of land in Leflore County, from Hughes. The Travelers Indemnity Company made Tyler a loan on the land for $1,000,000, which was secured by a first deed of trust. To secure part of the purchase price, Tyler gave Hughes a promissory note for $100,000 due on or before March 15, 1982. On September 1, 1978, Tyler conveyed the land to Whisenhunt and others (hereinafter Whisenhunt), and by the mutual agreement of all parties, Whisenhunt was allowed to assume the Travelers and Hughes loans.
Although the record is not clear on the circumstances surrounding the financial arrangements Whisenhunt made to purchase the property, apparently Whisenhunt assumed the $980,000 mortgage that was outstanding with Travelers, paid off $500,000 of that loan, reducing it to a total of $480,000 and Travelers in turn released 776 *1028 acres as security for the loan. Whisenhunt obtained a new loan from Travelers Insurance Company in the amount of $790,000 which consisted of the $500,000 used to pay down on the original loan and an increase of $290,000. As security for this loan, Whisenhunt put up the 776 acres released by Travelers on the original loan plus an additional 15 acres it had acquired.
On September 5, 1978, Hughes executed and delivered a subordination instrument in favor of Travelers which further subordinated his $100,000 promissory note to the two deeds of trust which Travelers held against Whisenhunt.
Hughes agreed to the assumption of the Tyler note by Whisenhunt and from that point on Hughes accepted Whisenhunt as his debtor under the Tyler note. Hughes accepted principal and interest payments from Whisenhunt.
On February 4, 1980, Whisenhunt prepaid the sum of $50,000 on the principal balance of the Tyler note, leaving a principal balance of $50,000 on the note. In exchange of the prepayment of the $50,000 principal, Hughes executed another subordination agreement in favor of the Travelers Insurance Company. This subordination agreement permitted Travelers to cancel the $480,000 loan and make a new loan for $600,000.
As further consideration of the prepayment of the $50,000 principal, Hughes executed a partial release to Whisenhunt. In the partial release, Hughes released 776 acres of land from his second mortgage.[1]
The property that remained after the subordination agreement and partial release to secure the remaining $50,000 principal left on the Hughes note was a second mortgage to 480 acres of the original Hughes property behind a first mortgage of $600,000 at an interest rate of 11%.
Tyler was not aware of the last subordination agreement and partial release executed by Hughes in favor of Whisenhunt prior to its execution and Tyler did not consent to it.
The only testimony in the record as to the fair market value of the property is the testimony of Hughes that in February, 1980, the land surrounding the property in question was selling for between $1,400 and $1,600 per acre. The parties in their stipulation agreements stipulated that on February 4, 1980, the fair market value of the property was in excess of $1,000 per acre.
The balance of the promissory note became due and payable on March 15, 1981, and is now past due, no amount having been paid to Hughes. Hughes made a demand upon Tyler for payment of the promissory note, but Tyler failed or refused to pay the note.
Whisenhunt defaulted on the payments to Travelers and on April 17, 1982, Travelers foreclosed its deed of trust on the property. No party other than Travelers bid any amount at the foreclosure sale, and Travelers bid in the property for the principal, interest and cost of the sale that was due on its loans. Hughes received no funds from the sale to apply to his note as a second lien holder. Appendix A is an explanation of the transactions which took place in this case and is designed to show the effect Hughes's subordination agreement and partial release of February 4, 1980, had on Tyler's security as a surety for Whisenhunt.
The trial court found that Hughes released Tyler from his obligation to pay the promissory note when he executed the partial release and subordination agreement without the knowledge or consent of Tyler.

STATEMENT OF THE LAW
A preliminary consideration must be resolved by this Court before considering Hughes's contentions, that being whether the U.C.C. applies to a negotiable promissory note secured by a real estate mortgage. The resolution of this consideration is not, *1029 however, outcome determinative as the common law rule is the same as that embodied in § 75-3-606 Miss. Code Ann. (1972). Zastrow v. Knight, 56 S.D. 554, 229 N.W. 925 (1930).
Section 75-3-112 Miss. Code Ann. (1972) states that "The negotiability of an instrument is not affected by ... a statement that collateral has been given to secure obligations .." This Court concludes, as did the Arizona Supreme Court in Best Fertilizers of Arizona, Inc. v. Burns, 117 Ariz. 178, 571 P.2d 675 (1979), that while the U.C.C. does not apply to security interest in realty, the promissory note is not a security interest in realty. The note does not cease to be negotiable even though it is secured by a mortgage. This view is further supported by Anderson, in his treatise on the U.C.C., Vol. 6, at 563.
Hughes's first contention is that § 75-3-606 and the discharge rules therein are not available to the original maker of a note. There is conflict of authority as to whether the term "any party" as found in U.C.C. § 3-606 applies to a primary party who did not sign for accommodation. A literal reading of the language of § 3-606 makes it so applicable.[2] There is however, a respectable line of authority that holds contra, and refuses to discharge a primary party unless he is in the position of a surety or is an accommodation party.[3] Today, we hold this much, that the mortgagee or security holder cannot escape some responsibility to such non-security interest debtor to avoid a harmful value impairment in the collateral. Any party, who has no right, title or interest in the security, will be released under the provisions of § 75-3-606 by such an action of the security holder. We conclude that Tyler is such a party.
Something approaching a trust relationship exists between the holder of a note and a party who has signed the note but has no right, title, or interest in the security. The holder cannot be at liberty to dispose of the collateral as he sees fit to the detriment of such non-protected party, and then expect such party to make up the difference between the impaired security and the debt. To hold otherwise would put the parties to the note at the mercy of the security holder.
The final issue to be decided by this appeal is whether Hughes unreasonably impaired the security so as to release Tyler under § 75-3-606 Miss. Code Ann. (1972).
As can be seen from the chart, which is Appendix "A" to this opinion, after Hughes executed the subordination agreement, allowed Travelers to issue a new increased loan to Whisenhunt, released the 776 acres of collateral in exchange for $50,000.00 payment on the principal and allowed an increase in the interest rate to 11%, there technically still remained on paper sufficient collateral to secure the loans.
Hughes argues that the time for determining whether there has been an impairment of collateral security is the time of the transaction which is alleged to have impaired the security, as opposed to some later date. We need not address that issue as we conclude that Hughes unreasonably impaired the security on February 4, 1980, when he executed the subordination agreement and released the 776 acres of land as security.
Real estate is not a liquid commodity. It is rarely readily marketable at its current appraised market value. Each parcel is unique, its sale depending upon locating a buyer willing to pay the price asked. For these and other reasons, it is common practice for lending institutions to require a comfortable margin between the amount of money loaned and the current appraised *1030 market value of the realty on which it is loaned.
According to Hughes, the realty was worth from $1,400 to $1,600 per acre. Until he executed the partial release on February 4, 1980, the debt was 71% of a $1,400 per acre land value and 62% of a $1,600 per acre land value. The partial release increased the debt percentage to 89% of a $1,400 per acre land value and 78% of a $1,600 per acre land value. See Appendix A.
An individual who sells real estate to another and allows the buyer to assume the mortgage and agrees to stay on that mortgage with the buyer has a right not to have the margin of security of the loan diminished to his detriment, even though on paper the loan would remain completely secured.
This Court is not without sympathy to Hughes, who no doubt was trying to be helpful to Whisenhunt. We must also observe, however, that if Hughes wanted to see how close he could put his foot to the fire without getting burned, he should be required to use his own and not Tyler's foot.
A secured party who takes it upon himself to impair the value of the security without consulting with and securing the consent of the secondarily liable party also runs the risk that if by such action he injures the secondarily liable party, then he, the releasor, must suffer the consequences.
As we held in Huey v. Port Gibson Bank, 390 So.2d 1005 (Miss. 1980), the issue of unjust impairment is a matter for the trial court's resolution, as it is essentially a question of fact. We certainly cannot say in this case that the trial judge was manifestly wrong in finding that Hughes unjustifiably impaired the collateral by his actions on February 2, 1980, or that Tyler was discharged as a result of the impairment.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
ROBERTSON and SULLIVAN, JJ., specially concur.

*1031 APPENDIX A

------------------------------------------------------------------------------------------------------------------------------------------------
 | | | | | | | $ Amount | Total | |
 | | | | | | | Per Acre | $ Amount | |
 | | | | $ | % of | % of | to Secure | to Secure | |
 | | | | Amount | Value | Value | 2nd | 2nd | |
 | | $ | # | Per | Mortgage| Mortgage | Mortgage | Mortgage | $ Excess |
Date | | Amount | Acres | Acre | @ $1400 | @ $1600 | @ $1400 | @ $1400 | Security | Interest
========|====================================|============|=======|========|==========|==========|===========|===========|==========|===========
3-15-77 | Original sale of land by | 1,000,000 | 1256 | 796 | -- | -- | --- | --- | --- | 9.0
 | Hughes to Tyler | | | | | | | | |
--------|------------------------------------|------------|-------|--------|----------|----------|-----------|-----------|----------|-----------
9-01-78 | Original loan reduced $500,000 | | | | | | | | |
 | in exchange for release of 776 | | | | | | | -- | |
 | acres; new loan issued for | 480,000 | 480 | 1000 | 71 | 63 | 400 | 192,000 | | | 9.5
 | $790,000 with 791 acres securing | | | | | | | | | |
 | it | | | | | | | |-|- 409.191 |
--------|------------------------------------|------------|-------|--------|----------|----------|-----------|---------|-|----------|-----------
9-01-78 | Sale of land from Tyler to | | | | | | | | | |
 | Whisenhunt, new loan secured | | | | | | | | | |
 | by the 776 acres released from | 790,000 | 791 | 999 | 71 | 62 | 401 | 317,191 | | | 9.5
 | original mortgage, plus additional | | | | | | | -- | |
 | 15 acres | | | | | | | | |
--------|------------------------------------|------------|-------|--------|----------|----------|-----------|-----------|----------|-----------
2-04-80 | Hughes executes subordination | | | | | | | | |
 | agreement & allows Travelers | | | | | | | | |
 | to issue a new increased loan | | | | | | | | |
 | to Whisenhunt & releases 776 | 600,000 | 480 | 1250 | 89 | 78 | 150 | 72,000 | 22,000 | 11.0
 | acres of security in exchange | | | | | | | | |
 | for a $50,000 payment on principal | | | | | | | | |
------------------------------------------------------------------------------------------------------------------------------------------------

*1032 ROBERTSON, Justice, concurring:
I concur in much of the opinion of the Court regarding this matter and I certainly concur in the result. Because there are several points with respect to which I believe clarification important, I add these concurring comments.

I.
First, my understanding of the essential facts: In March of 1977, Hughes sold 1256 acres of land to Tyler. To finance the purchase, Tyler obtained a loan from Travelers Indemnity Company and as evidence thereof and security therefor gave his note and first deed of trust to Travelers. In addition, and more important for present purposes, Tyler gave a $100,000 note to Hughes in payment of a portion of the purchase price, this $100,000 note being secured by a second deed of trust on all of the property. By reference to the ratio of fair market value of the property to debt, both promissory notes were as a practical matter well secured.
Some 18 months later, Tyler sold the property to Whisenhunt. Once this transaction had been consummated, Travelers was the holder of a new note and deed of trust from Whisenhunt. Again, more important for present purposes is the fact that Whisenhunt had assumed all obligations under Tyler's $100,000 note to Hughes. Tyler thus became secondarily liable to Hughes on that note, a liability which would be enforced only if Whisenhunt failed to pay.[1] Again, the fair market value of the 1256 acres covered by the second deed of trust was more than adequate so as the $100,000 note held by Hughes (the primary liability for which had been assumed by Whisenhunt) remained well secured in fact.
A little over 17 months later (in February of 1980), Whisenhunt, as the primary obligor, paid to Hughes the sum of $50,000. This payment had the effect of reducing the indebtedness owed Hughes under the original $100,000 purchase money promissory note to $50,000. More to the point, Tyler's obligation, as the party secondarily liable to Hughes, was reduced to $50,000. So far so good.
The problem is that at this point Hughes took the actions which give rise to Tyler's defense to this suit on the remaining $50,000 obligation on the note. Without the so much as a "by your leave", "kiss my foot" or, more specifically, the knowledge or consent of Tyler, Hughes did two things: First, Hughes released  gave away, if you will  776 acres of land from the lien of the second deed of trust securing the remaining $50,000 principal obligation. Perhaps more important, Hughes agreed with Whisenhunt and Travelers to subordinate his already junior deed of trust on the property to a new $600,000 first deed of trust securing a note payable with interest at 11 percent per annum. In short, when the dust settled, there was less acreage securing the $50,000 Tyler to Hughes note, and that acreage was subordinate to a greater debt at a higher interest rate than before. Suffice it to say that at this point in time the secured position of the note had in fact worsened substantially from the situation prior to February of 1980.
What is critical for present purposes is that, as the majority points out, "Tyler was not aware of the last subordination agreement and partial release executed by Hughes in favor of Whisenhunt prior to his execution and Tyler did not consent to it".

II.
The first question of law presented is whether Article 3 of the Uniform Commercial Code, Miss. Code Ann. §§ 75-3-101, et seq. (Supp. 1985) furnishes rules of decision governing the adjudication of this action at all. I certainly agree that Article 3 to the extent of its terms applies to all cases of commercial paper. Most assuredly, the fact that the obligation represented by a *1033 piece of commercial paper is secured by real estate does not oust Article 3 to the extent that it is otherwise applicable. My only real quibble with the majority here is the seemingly limiting reference to negotiability. (See majority opinion at p. 4) The fact that the note given by Tyler to Hughes  the note that is the subject of this action  may or may not have been negotiable is in no way determinative of Article 3 coverage. It is enough that the instrument is commercial paper within the meaning of Article 3 and that, as explained below, one of the provisions of Article 3 expressly governs.

III.
I agree with the majority opinion that Miss. Code Ann. § 75-3-606 (1972) controls and points our direction. More, however, needs to be said, for the issue whether an original maker of a note, whose obligations have been "assumed" by another party, is eligible for the protections afforded sureties under Section 3-606(1)(b) is one not free of doubt.
The language of the statute itself indicates that such a party could qualify for coverage under Section 3-606(1)(b):
The holder discharges any party to the instrument to the extent that without such party's consent the holder... .
(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.
No doubt Section 3-606 is often thought of as affording protection only to an accommodation party, see, e.g., FDIC v. Blue Rock Shopping Center, Inc., 567 F. Supp. 952, 37 UCCRS 283 (D.Del. 1983) (and authorities discussed therein). Still, the statutory language and the official comments indicate that any party who is in the position of a surety is eligible for the protection afforded by Section 3-606. As official comment 1 states:
The words `any party to the instrument' remove any uncertainty arising under the original section. The suretyship defenses here provided are not limited to parties who are `secondarily liable', but are available to any party who is in the position of a surety, having a right of recourse either on the instrument or dehors it, including an accommodation maker or acceptor known to the holder to be so.
Applying this to the case at bar, the question becomes whether, under other [non-UCC] law, the original maker (Tyler) is a party in the position of a surety. If the original maker has acquired such status and if this is known to the holder, discharge under Section 3-606(1)(b) should be available to the original maker/surety if otherwise appropriate under the facts.
There appears to have been no written assumption agreement or other writing which would define the legal posture of Tyler after the sale of Whisenhunt. The majority opinion correctly indicates that Hughes merely "accepted Whisenhunt as his debtor under the Tyler note", (Opinion at 2) and that "by the mutual agreement by all parties, Whisenhunt was allowed to assume the Travelers and Hughes loans". (Opinion at 1-2) In this context, the effect of such an assumption under state law, together with the intention of the parties, becomes important. See generally Wilmington Trust Co. v. Gesullo, 29 UCCRS 144 (Del.Super. 1980) (reciting that the intention of the parties is the most significant factor in determining accommodation status vel non). As indicated above, all of the evidence present here is consistent with the notion that the parties intended that Whisenhunt become primarily liable on the $100,000.00 note held by Hughes, with Tyler assuming suretyship or secondary liability status. Compare United States v. Malone, 326 F. Supp. 106, 110-11 (N.D.Miss. 1971).
Under our non-UCC law, when mortgaged property is sold and the buyer [here Whisenhunt] assumes the mortgage indebtedness, as opposed to buying the property "subject to" the mortgage indebtedness, the buyer becomes primarily liable on the note evidencing that indebtedness. The seller/original maker [here Tyler] is only *1034 secondarily liable. In the absence of clear evidence of the parties' intention to the contrary, the seller/original maker acquires and occupies the status of a surety. Thus, Section 3-606(1)(b) by its unequivocal terms should apply.

IV.
The next issue is whether the February 4, 1980 subordination and partial release  unauthorized by and without notice to Tyler  constituted an unjustifiable impairment of the collateral for the loan. I agree with the majority that it did. The most common types of impairment found within the scope of Section 3-606(1)(b) include the failure properly to record a mortgage or file a financing statement and the disposition of part or all of the security at less than its fair value. See generally, Annotation, 95 ALR 3d 962 (1979). Here, the creditor both released more than fifty percent of the mortgaged property from its mortgage and permitted the principal debtor to obtain a new and increased loan from the first mortgage holder, at a higher interest rate. Although either of these probably would suffice as a prohibited impairment of capital, certainly together they impair the value of the collateral to the surety.

V.
Finally, the extent to which the surety should be discharged must be determined, based on the extent to which the collateral was impaired. Miss. Code Ann. § 3-606(1)(b) (1972). In Huey v. Port Gibson Bank, 390 So.2d 1005 (Miss. 1980), we held that the question whether there was an unjust impairment should be resolved by the court, and the question of the extent of impairment should be resolved by the trier of fact. Id. at 1009. Precision in juridical concepts requires recognition that the question of "unjustifiable impairment" is not merely "essentially a question of fact". That terminology is too fuzzy. It is one of those questions alternatively labeled "a law application question", Boardman v. United Services Automobile Assn., 470 So.2d 1024, 1029 (Miss. 1985); a "mixed question of law and fact", Star Chevrolet Co. v. Green, 473 So.2d 157, 161 (Miss. 1985); or a question of "ultimate fact", Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983). For present purposes, it is a question which, once resolved by a trial judge, is beyond our authority to disturb, so long, of course, as it is supported by substantial evidence.
For these reasons, I would agree that the trial judge's finding of total discharge should be affirmed. Cf. Magnolia Homes Mfg. Corp. v. Montgomery, 451 F.2d 934 (8th Cir.1971) (applying Mississippi law and affirming a finding of total discharge, based on value of collateral released).
SULLIVAN, J., joins in this opinion.
NOTES
[1] This is the same 776 acres of land that secured the Travelers loan of $790,000. Hughes never had a lien on the 15 acres that Whisenhunt added to the security.
[2] Rushton v. U.M. & M. Credit Corp., 245 Ark. 703, 434 S.W.2d 81 (1968); Southwest Florida Production Credit Assoc. v. Schirow, 388 So.2d 338, (Fla App D4, 1980).
[3] Toomey v. Cammack, (1975, Dist.Col.App.) 345 A.2d 453, later app. (Dist.Col.App.) 379 A.2d 700; Main Bank of Chicago v. Baker, 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94 (1981); Commerce Union Bank v. Davis, 581 S.W.2d 142 (Tenn. App. 1978); Hopper v. Ryan, 581 S.W.2d 237 (1979, Tex.Civ.App.Waco); Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc., 158 W. Va. 170, 209 S.E.2d 573 (1974).
[1] The Mississippi law on the effect of a loan assumption is well put in Malone v. United States, 326 F. Supp. 106, 110-11 (N.D.Miss. 1971).