### Donald and Claudette Bissonnette v. Nicholas J.H. Wylie, Daniel E. Mendl and Martin V. Lavin

[693 A.2d 1050]

No. 96-029

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.), Specially Assigned.**

Opinion Filed March 28, 1997

Motion for Reargument Denied April 23, 1997

*Donald E. O'Brien*, Burlington, for Plaintiffs-Appellees.

*Leslie C. Pratt*, Montpelier, for Defendants-Appellants.

**Dooley, J.** This case is here for the second time. See *Bissonnette v. Wylie*, 162 Vt. 598, 654 A.2d 333 (1994) (*Bissonnette I*). On remand from this Court, the Franklin Superior Court held that two of the defendants, sureties on a promissory note, could not claim discharge of their liability under 9A V.S.A. § 3-606,[1] which discharges a surety of its obligation if the creditor unjustifiably impairs the collateral. This decision was based on the conclusion that plaintiffs, who were creditors on the promissory note, had a legal obligation to subordinate their mortgage, and thus did not unjustifiably impair the collateral when they subordinated their mortgage three times. Defendants contend that the trial court erred in concluding that plaintiffs had a legal obligation to subordinate their mortgage and that plaintiffs did not unjustifiably impair the collateral when they discharged their mortgage, without defendants' consent, to the Bank of Vermont. We affirm the court's holding as to plaintiffs' obligation to subordinate their mortgage, but reverse as to the reasonableness of the discharge. We remand to determine the extent of impairment of the collateral, if any.

In *Bissonnette I*, we held that comakers of a promissory note may be discharged under 9A V.S.A. § 3-606 when the comaker is in the position of a surety, the creditor obtains actual knowledge of the suretyship, and the creditor unjustifiably impairs the collateral. 162 Vt. at 605-07, 654 A.2d at 338-39. We remanded the case to the trial court to determine whether plaintiffs had used reasonable care to prevent impairment to the collateral and the extent of any impairment. *Id.* at 611, 654 A.2d at 341.

On February 5, 1986, plaintiffs Claudette and Donald Bissonnette and defendants Nicholas Wylie, Daniel Mendl, and Martin Lavin entered into a sales agreement in which defendants agreed to purchase approximately two acres of land (parcel one) with a ranch house and two-story brick duplex from plaintiffs for $210,000. The property was adjacent to another parcel of land owned by defendants (parcel two). The agreement provided that defendants would pay

---

[1] 9A V.S.A. § 3-606 has been replaced with 9A V.S.A. § 3-605. 1993, No. 158 (Adj. Sess.), § 12, eff. Jan. 1, 1995.

plaintiffs $110,000 in cash, obtained from the Vermont National Bank and secured by a first mortgage, and $100,000 in the form of a promissory note to plaintiffs, secured by a second mortgage on the property. The sales agreement had an addendum that required plaintiffs to "subordinate the 2nd mortgage at Purchasers [sic] option for any purposes of improving, preserving and developing the property." The sale was completed in June 1986.

During the course of the next three years, plaintiffs subordinated their mortgage three times. In October 1986, defendants wanted to borrow $1,540,000 from Vermont National Bank to construct the Highpoint Office Building. Plaintiffs were asked and agreed to subordinate their mortgage. Defendants' attorney drafted a new mortgage deed for plaintiffs, which was subject to three mortgage deeds — the first mortgage of $110,000 and two others dated November 3, 1986 — all in favor of Vermont National Bank, totalling $1,650,000 and covering both parcel one and parcel two. These mortgages also contained future advance clauses. All parties believed that plaintiffs were required by the purchase and sales agreement to subordinate to these new mortgages. There was no discussion as to whether the subordination clause would be part of the new mortgage deed. On October 21, 1987, defendants replaced one of the two existing construction loans created on November 3, 1986 with a new promissory note. The result of this transaction was an increase in the debt owed to Vermont National Bank by $380,000. The new note specified that the whole amount, including the additional $380,000, was secured by the preexisting mortgages.

In April 1989, defendants received preliminary approval for the second phase of development from the Colchester Planning Commission. Defendants were planning to build an additional office building, restaurant, bank, and parking spaces to serve the existing office building.

On May 3, 1989, defendants Mendl and Lavin (hereinafter surety defendants) transferred their interest in the properties to defendant Wylie, who agreed to assume the mortgage to plaintiffs and to indemnify surety defendants if either were obligated to pay any sums as a result of the mortgage or promissory note. Plaintiffs received actual notice of the transfer by letter, but were not asked to consent to the transfer or to Wylie's assumption of the debt. Surety defendants never informed plaintiffs that they would object to further subordination of their mortgage.

On this same day, plaintiffs subordinated a second time to a mortgage to Vermont National Bank, this time in the amount of

$2,108,000. This added $458,000 of debt with a priority before plaintiffs' mortgage.[2] Of this amount, $380,000 was attributable to the debt added on October 21, 1987 and $78,000 was new money.

On June 30, 1989, plaintiffs further subordinated their mortgage to a $2,700,000[3] mortgage to the Bank of Vermont. A portion of this money was given to Vermont National Bank to reduce Wylie's debt. This enabled Vermont National Bank to reduce the coverage of its mortgage to include only two of three units in the Highpoint Building and a small area of land surrounding the building, which in turn allowed the Bank of Vermont to secure its mortgage with the balance of the Bissonnette property.

In the spring of 1991, both plaintiffs and Vermont National Bank learned that Wylie was having financial difficulties. Wylie had a debt of $1,623,159 due to Vermont National Bank, which brought a foreclosure action. Wylie also defaulted on plaintiffs' note and on the Bank of Vermont's notes. The amount due on all the notes far exceeded the value of the properties, and plaintiffs filed this suit to recover what was due on their note. Surety defendants claimed that plaintiffs unjustifiably impaired the collateral by subordinating their mortgage to those of the banks.

In August 1991, the Bank of Vermont's agent contacted plaintiffs' attorney by letter and informed plaintiffs that a conditional sales contract for the office building had been signed, but plaintiffs had to discharge their lien to allow the sale to go through. The bank explained that if plaintiffs did not discharge their lien, it would be forced to foreclose on its mortgage, leaving plaintiffs without any payment because of the inadequate equity in the properties. Plaintiffs accepted the bank's offer in order to mitigate their damages, and were paid $10,457.50 from the proceeds of the sale of the building.

Plaintiffs' action was originally decided in favor of surety defendants on summary judgment, but we reversed and remanded because "defendants did not meet their burden of establishing, as a matter of law, unjustifiable impairment, nor the extent of any impairment." *Id.* at 611, 654 A.2d at 341. On remand, the case was tried to court. By findings and conclusions issued on October 19, 1995, the superior

---

[2] It actually added only $78,000 because the added $380,000 was secured by the original mortgage pursuant to the future advance clause.

[3] In *Bissonnette I*, 162 Vt. 598, 601, 654 A.2d 333, 335 (1994), we indicated that the amount of the mortgage to the Bank of Vermont was $2,600,000. In fact, the original mortgage was for $2,700,000. Wylie paid off $100,000 in principal before plaintiffs filed *Bissonnette I*, and that decision referred to the mortgage balance at the time of filing.

court concluded that plaintiffs had a legal obligation to subordinate their mortgage, and thus surety defendants could not claim "discharge based on impairment of the collateral when it was they who legally obligated the Plaintiffs to [subordinate] and impair the collateral." Judgment was entered for plaintiffs in the amount of $133,111.95, and surety defendants appealed, raising three issues: (1) whether the loan proceeds were actually for the preservation, development, or improvement of the property, (2) whether plaintiffs had a legal obligation to subordinate their mortgage for the development of *parcel two*, and (3) whether plaintiffs used reasonable care when they discharged their mortgage, without surety defendants' consent, to the Bank of Vermont for $10,457.50.

On the first issue, surety defendants argue primarily that plaintiffs did not have a legal obligation to subordinate their mortgage to the additional $458,000 in debt to Vermont National Bank incurred on May 3, 1989, because the money from the bank loan was not used for the preservation, development, or improvement of the property as specified in the sales agreement.[4] Based on this premise, surety defendants contend that the collateral was impaired by plaintiffs' subordination, and thus they should be discharged from their obligations as sureties.

The evidence on the purpose and use of Wylie's additional debt to Vermont National Bank is sparse. As set out above, the face amount of the mortgage to Vermont National Bank was increased by $458,000 at the same time that surety defendants transferred their interest in the properties to Wylie. Plaintiffs subordinated their mortgage to the new, higher mortgage to Vermont National Bank. This new mortgage actually added only $78,000 to the debt with priority before plaintiffs' mortgage; the additional $380,000 was already secured by the original mortgage under the future advance clause. See 8 V.S.A. § 1207 (validating future advance clauses).

Surety defendants' complaints are vague and general. They complain that plaintiffs failed to investigate the use of the additional funds before agreeing to subordinate to the new mortgage. Surety defendants did not know what use was made of the additional $78,000 and were suspicious of it because Wylie once told one of the plaintiffs that he was out of money and did not know what he might build.

---

[4] In the trial court, surety defendants argued that the obligation to subordinate, as stated in the sales agreement, did not survive the 1986 closing because it was not stated in the mortgage deed or the promissory note. The trial court found against them on this point, and they have not appealed this issue.

■ First, as to the $380,000 amount, we conclude that defendants do not have a valid complaint. The actual borrowing occurred when defendants were still involved in the project, and this debt became secured at that time pursuant to the future advance clause in the original mortgage. Vermont law allows a subsequent mortgagee on the same property to prevent enlargement of the superior mortgage by way of future advances, by giving notice to the superior mortgage holder. See *id.* Plaintiffs failed to give notice, but at a time when they had no duty to surety defendants to do so because the surety relationship had not yet been created. See *Bissonnette I*, 162 Vt. at 606, 654 A.2d at 338 (creditor must respect rights of sureties in all subsequent dealings with them).

■ As to the additional $78,000, surety defendants' complaints might be determinative if plaintiffs had the burden of proof to justify the purposes of the mortgages that were given priority. We held in *Bissonnette I*, however, that the burden of proof on unjustified impairment of the collateral was on defendants. *Id.* at 609, 654 A.2d at 340 (defendants must show "collateral was unjustifiably impaired"). Thus, it was surety defendants' burden to show that the proceeds of the secured loans to the bank were not used for a proper purpose. The evidence on the use of the additional $78,000 was as available to surety defendants as to plaintiffs. Defendants failed to meet their burden of proof that the additional debt secured by the May 1989 mortgage to Vermont National Bank was not for a purpose within plaintiffs' obligation to subordinate.

■ In reviewing decisions of the trial court, we will not disturb the court's findings of fact unless, taking the evidence in the light most favorable to the prevailing party, they are clearly erroneous. V.R.C.P. 52(a); *Cab-Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 434, 571 A.2d 671, 672 (1990).

Defendants' second claim is that plaintiffs had no duty to subordinate to a mortgage on parcel two, and unjustifiably impaired the collateral when they did so. The trial court resolved this issue on a theory of equitable estoppel, holding that because defendants induced plaintiffs to take a substitute mortgage on both parcels, subject to the prior mortgages to Vermont National Bank, they were estopped from arguing that plaintiffs did not have the legal obligation to subordinate to mortgages covering parcel two. We agree with the trial court's conclusion, but use a different rationale to reach it.

The subordination agreement states that "[s]ellers agree to subordinate the 2nd mortgage at Purchasers [sic] option for any purposes

of improving, preserving and developing the property." Surety defendants read the reference to "the property" as meaning only parcel one and restricting the obligation to subordinate to parcel one. Plaintiffs, on the other hand, point out that the language does not speak to the property to be covered by plaintiffs' subordinate mortgage, or any superior mortgages; it merely restricts the purpose of the borrowing to "any purposes of improving, preserving and developing" parcel one. Particularly when read in light of defendants' ownership of parcel two and evident intent to develop them together, we conclude that the clause is so broadly written that its meaning is ambiguous. See *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988) (when inquiring into existence of ambiguity, court may consider circumstances surrounding making of agreement). Reasonable persons could differ as to its interpretation. See *id.* at 577, 556 A.2d at 83.

The evidence supports only one possible construction of the ambiguous agreement. The dominant evidence is the understandings of the parties as reflected in their November 1986 action in expanding the mortgage security to both parcels and subordinating it to a mortgage to Vermont National Bank to develop the properties together. The use of this evidence is explained by Corbin:

> In the process of interpretation of the terms of a contract, the court can frequently get great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or in receiving performance under it. . . . The process of practical interpretation and application . . . is merely a further expression by the parties of the meaning that they give and have given to the terms of their contract previously made. There is no good reason why the courts should not give great weight to these further expressions by the parties, in view of the fact that they still have the same freedom of contract that they had originally. In cases so numerous as to be impossible of full citation here, the courts have held that evidence of practical interpretation and construction by the parties is admissible to aid in choosing the meaning to which legal effect will be given.
>
> . . . .
>
> The parties may employ language the application of which they know to be uncertain and to which they are too indifferent at the time of executing the contract to take the trouble to make certain. This . . . causes much greater

dependence to be put upon their subsequent practical interpretation and construction.

3 A. Corbin, Corbin on Contracts § 558, at 249, 251-53 (1960); cf. *Paradise Restaurant, Inc. v. Somerset Enters., Inc.*, 164 Vt. 405, 409-10, 671 A.2d 1258, 1261-62 (1995) (distinguishing Corbin on basis that contract at issue was not ambiguous). We adopted this rule in *Murphy v. Britton*, 109 Vt. 522, 525, 1 A.2d 724, 725 (1938), a case in which this Court also determined the interpretation of an allegedly ambiguous contract based on the construction placed on it by the parties.

■ The parties' October 1996 actions in combining the parcels for the security of both plaintiffs and the bank, joined in by surety defendants, belie the interpretation of the subordination agreement surety defendants now put forward. Defendants believed they had the right under the sales agreement to join the parcels for financing purposes as long as plaintiffs' security was maintained. Indeed, they apparently believed that they improved plaintiffs' security position by extending the new mortgage to parcel two, the parcel on which the building was to be built. We conclude that the only possible interpretation of the subordination clause is to require plaintiffs to subordinate to mortgages that would cover the total development on the parcels. There is no error on this issue.

Surety defendants' third claim is that the trial court failed to find that plaintiffs were negligent in discharging the mortgage for a reduced price in 1991. Although the surety defendants raised this argument below, and the trial court made findings about the release of the mortgage, the trial court failed to deal with this claim.

The discharge of the mortgage was done without surety defendants' knowledge or consent. Ordinarily, before the holders of a note may release their security interest in the collateral, they must obtain the express consent of the surety. See *Magnolia Homes Mfg. Corp. v. Montgomery*, 451 F.2d 934, 937 (8th Cir. 1971) (under UCC § 3-606, holder could not dispose of collateral at substantially less than its reasonable value without consent of surety, regardless of terms of note); *Prigal v. Kearn*, 557 So. 2d 647, 648 (Fla. Dist. Ct. App. 1990) (surety on promissory note discharged from liability when holder releases collateral security); *Hughes v. Tyler*, 485 So. 2d 1026, 1030 (Miss. 1986) (surety on promissory note discharged because secured party subordinated its mortgage and partially released secured property without consent of surety); *Godfrey State Bank v. Mundy*,

412 N.E.2d 1131, 1134, 1138-39 (Ill. App. Ct. 1980) (accommodation party discharged under UCC § 3-606 where fire destroyed collateral and bank released insurance proceeds to mortgage holder without consent from accommodation party); *Beneficial Fin. Co. of Norman v. Marshall*, 551 P.2d 315, 320 (Okla. Ct. App. 1976) (sale of collateral without consent of accommodation maker was unjustifiable impairment of collateral under UCC § 3-606); see generally Annotation, *Discharge of Accommodation Maker or Surety by Release of Mortgage or Other Security Given for Note*, 2 A.L.R.2d 260 (1948 & Supp. 1996); Annotation, *What Constitutes Unjustifiable Impairment of Collateral, Discharging Parties to Negotiable Instrument, Under UCC § 3-606(1)(b)*, 95 A.L.R.3d 962 (1979 & Supps. 1985, 1996).

██ In *Bissonnette I*, we held that plaintiffs must use "reasonable care" to protect the sureties' interests. 162 Vt. at 610, 654 A.2d at 341. We now hold that failure to obtain the sureties' consent before disposing of the collateral was a breach of the standard of reasonable care, as a matter of law. This holding alone, however, is not determinative of the action. As we held in *Bissonnette I*, defendants also have the burden to show the extent of any impairment in order to offset that amount against their liability. *Id.* at 609, 654 A.2d at 340. The proper measure of such offset is the extent to which the collateral was discharged for consideration below its actual value. Although evidence was offered on this point, the trial court failed to make findings on the extent of impairment, if any. We remand for such determination.

*Affirmed in part and reversed in part; remanded to determine the extent of impairment, if any, the release of plaintiffs' security interest had on the collateral.*