308 So.2d 148 (1975)
Angelo GUIDA, Appellant,
v.
The EXCHANGE NATIONAL BANK OF TAMPA, a National Banking Corporation, Appellee.
No. 72-388.
District Court of Appeal of Florida, Second District.
February 5, 1975.
Rehearing Denied March 10, 1975.
*149 Sam Bucklew, of Bucklew & Ramsey, and Don M. Stichter, Tampa, for appellant.
Holland & Knight, Tampa, for appellee.
HOBSON, Judge.
Appellant appeals a final judgment entered against him wherein he was held liable as an endorser of two promissory notes made payable to the appellee, hereinafter referred to as bank. The two notes in question were executed by Rover Shoe Company, hereinafter called Rover, in the amount of $20,000 each. The first of these notes was dated October 12, 1967, payable within 30 days, and the second note was dated November 2, 1967, payable within 30 days.
In December 1967, Rover needed additional working capital and Guida, with one Y.C. Fernandez, then President of Rover, approached the bank for an additional loan. Rover at this time attempted to borrow $35,000 from the bank but was refused unless sufficient collateral was placed with the bank to cover the indebtedness of Rover to the bank. Thereafter, on January 5, 1968, Rover entered into a security agreement with the bank and placed, as the inventory, the following:
"... (a) `Inventory' means, but is not restricted to raw materials, goods in process and finished products. The finished products include but are not restricted to that merchandise located in the plant which is under N.Y. Terminal Warehouse Co. warehouse receipts, including all raw materials, work in process, finished goods and other goods and tangible property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Borrower's business; ..."
in the custody of the New York Terminal Warehouse Company. The pertinent provisions of the security agreement provided as follows:
"In consideration of loans or advances made or to be made by Bank to Borrower, and for other value received by Borrower, *150 the parties hereto, intending to be legally bound, agree as follows:
* * * * * *
"3. As security for the payment of all loans and advances now or in the future made hereunder and for all Borrower's liabilities, including any extensions, renewals or changes in form of any thereof, Borrower hereby assigns to Bank and grants to Bank a security interest in: (a) all inventory owned by Borrower at the date of this agreement; (b) all inventory at any time hereafter acquired by Borrower; and (c) all proceeds of such inventory."
After the execution of the security agreement and the materials covered by said agreement were placed in the New York Terminal Warehouse Company, the bank loaned Rover an additional $35,000. Guida did not personally endorse this $35,000 note. The overwhelming testimony was that the value of the materials placed with the warehouse was approximately $100,000.
The first question presented in this appeal is whether or not the security agreement secured the two $20,000 notes endorsed by Guida which were executed prior to the security agreement and, in fact, were in default at the time of the execution of the security agreement.
The trial court found that there was some question as to whether the language of the security agreement would allow the bank to apply the security to the pre-existing notes that Guida had endorsed. The trial court evidently felt that the two quoted provisions of the security agreement rendered it ambiguous and, therefore, allowed parol testimony to be introduced. Guida strenuously objected to the introduction of the parol testimony and has assigned this ruling by the trial court as error. We agree with the trial court that it was correct in allowing parol evidence in this cause. Friedman v. Virginia Metal Products Corp., Fla. 1952, 56 So.2d 515.
We cannot agree with the trial court that the evidence supported the bank's contention that it was not the intention of the parties to the security agreement that said agreement secured the two pre-existing notes involved in this appeal. Guida has consistently taken the position that the security agreement secured the two previous notes endorsed by him, whereas the bank at the trial through testimony of its representative urged that this was not the intention of the parties. Guida introduced into evidence a letter from one A.G. Divers, Vice President of the bank, which we think clearly establishes the fact that the bank considered the security agreement as collateral for these pre-existing indebtednesses. The pertinent part of the letter reads as follows:
"On August 20, 1968 I wrote Mr. Frank Muscarella concerning the indebtedness of Rover Shoe Company here. I wrote him as follows:
"`As you probably know, Rover Shoe Company owes this bank $40,000.00. The notes were negotiated by Mr. Frank Garcia as President and Mr. Angelo Guida, as Secretary-Treasurer. A note for $20,000.00, which renewed previous indebtedness, was taken October 12, 1967 for thirty days. An additional $20,000.00 was loaned to the company November 2, 1967 for thirty days. Interest to date is $2,184.72 and accumulates at the rate of $7.22 daily.
"`Because the notes have been due for quite some time and the company has made no effort to pay them, payment is hereby demanded in full. If payment in full is not received in ten days, it will be necessary to turn them over to our attorney for collection.

"`As security on the loan we have a general lien on inventory, including but not restricted to raw materials, goods in process and finished goods, and accounts receivable and contract rights. Please do not make it necessary for us to resort to the collateral.'" [emphasis supplied]
*151 In view of the foregoing and the entire record on appeal, we hold that the trial court erred in holding that the security agreement was not intended to secure the two pre-existing notes endorsed by Guida.
The bank, at the time of the payment of the new note in the amount of $35,000, released the security which was covered by the security agreement without the knowledge or consent of Guida. In fact, no demand was made on Guida as endorser of the two prior notes until approximately six months after the bank released the collateral.
The trial court in its final judgment found that:
"... [E]ven if the property pledged under the security agreement for the new $35,000 loan could have been applied to the pre-existing indebtedness, the conduct of the bank in releasing the security at the time of the payment of the new note was not an unjustifiable impairment of collateral for the indebtedness sued upon in this litigation and, accordingly, would not result in a discharge of the liability of the defendant Guida as an endorser."
After the execution of the security agreement, Y.C. Fernandez, who was President of Rover, approached one Jack Chapman, President of Leeds Shoes, seeking to sell the pledged shoes under the security agreement to Leeds. At the time Rover owed Leeds approximately $99,000. Fernandez requested Leeds to purchase as much of the pledged security as it could use in exchange for the payment of sufficient cash to pay the new $35,000 note to the bank and offset the remainder of the purchase price against the monies owed by Rover to Leeds. Leeds agreed to this and selected the bulk of the pledged inventory, giving Rover the required cash to satisfy the $35,000 note to the bank and credited the balance against the debt due Leeds from Rover. Leeds paid Rover $70,000 for the shoes it acquired, which were the bulk of the inventory covered by the security agreement. Thirty-one thousand dollars ($31,000) of the purchase price went to satisfy the balance of the $35,000 note to the bank, and Rover was credited on the company books of Leeds for $39,000 against its indebtedness to Leeds. Notwithstanding the purchase price of $70,000, Mr. Chapman, who was President of Leeds Shoes, testified as the bank's witness that the value of the shoes which Leeds purchased from Rover was between $42,000 to $45,000. Mr. Calderazzo, a witness for Guida, testified that he had been in the shoe business since 1921 and that he had been with Rover since its inception. He further testified that the value of the unfinished leather goods that had been placed in possession of the New York Terminal Warehouse Company was in excess of $100,000. Mr. Frank Garcia, who was formerly President of both Leeds and Rover, testified that the value of the shoes placed in the New York Terminal Warehouse Company as shown by the warehouse receipts to be more than $100,000 was the fair value of the shoes. In addition to these shoes, there were raw materials placed with the warehouse which were governed by the security agreement.
The record is uncontradicted that at no time was Guida informed by Rover, Leeds or the bank that the collateral under the security agreement was being voluntarily released by the bank. The only reason given by the bank for releasing all the collateral without obtaining payment of the two $20,000 notes was given by Mr. Divers, Vice President of the bank, to be:
"It was my impression by releasing the collateral, I would be assisting Rover Shoe Company in staying in business and, of course, it was in the best interest of the bank that the company continue in business so that ultimately all of the loans due from Rover to the bank would be paid."
*152 Florida Statute, Section 673.3-606, which is a provision of the Uniform Commercial Code, provides as follows:
"673.3-606 Impairment of recourse or of collateral.

(1) The holder discharges any party to the instrument to the extent that without such party's consent, the holder:
(a) * * *
(b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."
In addition, the applicable general law (F.S. § 671.103) as to the duty of a creditor under circumstances such as these is clearly set out in 69 Am.Jur.2d § 229, Secured Transactions, p. 55, as follows:
"A creditor who had an obligation executed by principal and surety, and who had also a collateral security from the principal, had to appropriate the proceeds of the security to the payment of the debt or hold it for the benefit of the surety, who, if he paid the debt, would be subrogated to the rights of the creditor. Since this was the duty of the creditor, if he surrendered such collateral security without the knowledge of the surety, the latter was discharged, entirely or pro tanto, according to the value of the security thus surrendered."
The overwhelming evidence appearing in this record establishes the fact that the bank breached its duty to Guida when it released the collateral under the security agreement without the knowledge or consent of Guida as the endorser of the two $20,000 notes. The record also establishes that the value of the collateral released by the bank was sufficient to satisfy the outstanding indebtedness represented by the two notes which Guida had endorsed.
For the foregoing reasons the judgment appealed is
Reversed.
McNULTY, C.J., and BOARDMAN, J., concur.