In re: **Charles ALCOCK; Betty Alcock, Debtors.**

**Charles ALCOCK; Betty Alcock, Appellants,**

v.

**SMALL BUSINESS ADMINISTRATION, Appellee.**

**No. 93–15963.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1994.

Decided March 22, 1995.

Robert Mehlhaff, Souza, Coats, McInnis & Mehlhaff, Tracy, CA, for appellants.

Jeffrey W. Eisinger, Asst. U.S. Atty., Fresno, CA, for appellee.

Before: LAY,* PREGERSON, and O'SCANNLAIN, Circuit Judges.

LAY, Senior Circuit Judge:

Charles and Betty Alcock appeal an order of the Bankruptcy Appellate Panel ("BAP") in a Chapter 11 proceeding allowing the Small Business Administration's ("SBA") claim for the deficiency on a loan upon which Charles Alcock signed as a guarantor. The bankruptcy judge rejected Alcock's arguments that he should be discharged from his guaranty obligation because the SBA and its participating lender, Crocker Bank ("Crocker"), unjustifiably impaired the collateral, disposed of the collateral in a commercially unreasonable manner, and failed to give him notice of the disposition. The BAP affirmed the order of the bankruptcy judge in an unpublished memorandum opinion. We now reverse.

## BACKGROUND

On September 27, 1983, Top Pac Growers and Shippers ("Top Pac"), a tomato packing and shipping company, borrowed $600,000 from Crocker secured by a note guaranteed by the SBA for seventy-five percent of the amount due ("SBA Note"). On the same day, Crocker extended Top Pac an additional $500,000 line of credit ("Crocker Line"). The

---

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

SBA was secured by a first deed of trust to the real property at one of Top Pac's plant locations. Crocker was secured by a deed of trust on the real property, subordinated to the SBA's first-priority deed. Crocker and the SBA were also secured by a perfected security interest in Top Pac's equipment; in its intangible assets; and by the guaranties of several parties, including Alcock, a Top Pac stockholder.

On September 28, 1983, Crocker Bank informed the SBA that it was not willing to advance the $500,000 line of credit if it only had the second lien on the real property. The SBA agreed to subordinate its interest in the real property to that of Crocker Bank on September 29, 1982, retaining the first-priority interest in the equipment. The SBA entered into this new agreement because it felt adequately collateralized by the interest in the equipment and the net worth of the guarantors. The guarantors were not informed of the change in priority of the real estate liens.

In the spring of 1984, Top Pac defaulted on the loan. The SBA honored its guaranty to Crocker Bank, and the SBA Note was assigned to it. The SBA declined any interest in the real property. Crocker foreclosed on the real property in March 1985 and purchased it for $130,000 at a trustee's sale in partial satisfaction of the amount owed on the Crocker Line.[1]

In January 1985, Crocker recommended a broker to Top Pac to facilitate the sale of the equipment. The broker, Emilio Lemeni, and Top Pac reached an agreement for the sale of the equipment for $94,000. Lemeni was delayed in dismantling the equipment and sent three payments that were not required by the contract between July and December 1985, apparently to compensate for the failure to dismantle the equipment. The first payment was made to Top Pac, and the remaining two were made to Crocker after

Crocker sent a letter to Lemeni requesting that all future payments be made to it. Also in January 1985, Crocker Equipment Leasing sent the SBA documents showing it had a first lien on a portion of Top Pac's equipment. The SBA acknowledged Crocker Equipment Leasing's lien and applied $5,000 of the money received from the sale of the equipment toward it.

At some point between December 1985 and March 1986, the equipment was disassembled and removed from Top Pac's premises. It is unclear from the record who authorized the removal or took the equipment. Only $25,-000 had been received in payment; thus, $69,000 remained unpaid.

Alcock filed for Chapter 11 bankruptcy in March 1986. The SBA filed a claim for the deficiency on the SBA Note for $507,016. Alcock filed this action to bar the SBA's claim in April 1990. The bankruptcy judge adopted the findings of fact of the SBA and ruled in its favor. The BAP affirmed the judgment in favor of the SBA in April 1993.

## DISCUSSION

■ Alcock claims his obligation as guarantor of the note is discharged because the SBA unjustifiably impaired the value of the collateral by subordinating its first lien on the real estate to that of Crocker Bank, paying out part of the proceeds from the sale of the equipment to Crocker Equipment Leasing, and permitting the equipment to be disassembled and removed before payment was received.[2] He also claims he may avoid his obligations under the guaranty because the SBA failed to dispose of the collateral in a commercially reasonable manner and because it failed to give notice to Alcock of the disposition. We need only address the change in lien priority.

■ Alcock relies on section 3606 of the California Commercial Code which provides in pertinent part:

---

1. Crocker had extended Top Pac only $150,000 on the Crocker Line, considerably less than the $500,000 limit.

2. This Court overturns the findings of the bankruptcy court only if they are clearly erroneous. Fed.R.Civ.P. 52(a). Findings of fact prepared by counsel and adopted by the trial court are sub-

ject to greater scrutiny than those authored by the trial judge. *Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir.), *cert. denied*, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981). This Court reviews conclusions of law *de novo*. *In re Kristal*, 758 F.2d 454, 455 (9th Cir.1985).

The holder discharges any party to the instrument to the extent that without such party's consent the holder ... (b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.[3]

Cal.Com.Code § 3606 (Deering 1988) (repealed 1992).[4] He contends that by subordinating its lien on the real property to that of Crocker Bank, the SBA unjustifiably impaired the value of the collateral without his consent, thereby discharging his obligation as guarantor. He claims that if the SBA had retained the priority lien on the property, the deficiency would have been substantially smaller because the packing plant could have been sold as a "going concern." Once the SBA no longer had a first priority lien on both the land and equipment, however, and the packing plant could not be sold as a going concern, Alcock alleges the market value of the collateral as a whole fell dramatically.[5]

The BAP acknowledged there was a reduction in value.[6] The SBA never challenges Alcock's contentions that the switch reduced the value of the equipment by more than $500,000 and substantially impaired the collateral as a whole. Thus, we find the SBA had essentially waived any claim that no impairment occurred. Nevertheless, the BAP and bankruptcy judge held that Alcock was not released from his obligation under the guaranty because the impairment of the collateral by reason of the switch in lien priority was not "unjustifiable." Rather, both courts found the SBA was properly serving the interests of the corporation by ensuring that it had the credit that it needed.

■ Alcock continues to argue, however, that while the subordination agreement may have been justified with respect to the obligor (Top Pac), it was not justified with respect to the guarantors. We agree. Section 3606, which was taken directly from the Uniform Commercial Code ("U.C.C."), is designed to protect unconsenting sureties from lenders' actions that prejudice them by reducing the value of the collateral. *See, e.g., Langeveld v. L.R.Z.H. Corp.,* 74 N.J. 45, 376 A.2d 931, 934 (1977) (stating this section of the U.C.C. is designed to protect sureties and provides them with all of the benefits of the principal debtor); U.C.C. § 3–606, cmt. 5 (stating this protection is a "suretyship defense"). Given this statutory purpose, whether such an impairment is "unjustifiable" must be determined with reference to surety's interests, not the borrower's. For

---

**3.** California's commercial code, adopted as federal common law, provides the relevant rule of decision. *Great Southwest Life Ins. Co. v. Frazier,* 860 F.2d 896, 899–900 (9th Cir.1988).

**4.** Although this particular section of the California Commercial Code was repealed in 1992, impairment of collateral as a suretyship defense is retained in section 3605(e) in slightly different language. Cal.Com.Code § 3605(e) (Deering 1994). Both parties seem to assume section 3606 is controlling.

**5.** Alcock focuses specifically on the value of the equipment. He alleges the value of the machinery and equipment fell from over $650,000 to $94,000, the price at which it was ultimately sold. Because both lower courts found the change in the lien priority was justified, however, neither tribunal addressed the extent to which this action impaired the equipment's value or the value of the packing plant as a whole.

**6.** Although the bankruptcy judge analyzed whether the agreement to alter the lien priority was unjustified, he never explicitly stated whether Alcock had shown there was an impairment. The BAP seemed to make such a finding: "Al-

cock asserts that the switch in lien priority diminished the total amount and value of the property given as security to the SBA. We acknowledge Alcock's argument has merit...." *Alcock v. Small Business Admin.,* 157 B.R. 23, 27 (9th Cir. BAP 1993).

Later in its opinion, the BAP rejected Alcock's contention that the fair market value of the real estate at the time it was sold was higher than the bid price. Alcock insists the fair market value of the real estate greatly exceeded the $130,000 that Crocker paid for it at the trustee's sale because the priority had been valued at $320,000 two years earlier. We find no reason to disagree with the BAP's conclusion that Alcock has not produced sufficient evidence that the value of the real estate *alone,* as separated from the packing plant equipment, was worth more than $130,000 at the time of the sale. Nevertheless, we find the question of the proper bid price for the real estate *alone,* is a completely separate issue from the impact the switch in the lien priority had on the total value of the collateral. Had the plant been sold as a going concern, the BAP seems to acknowledge and we agree that its value would exceed the combined value of the land and equipment sold separately.

this reason, numerous courts, in interpreting other states' U.C.C. § 3–606 provisions, have concluded that lenders' actions which impair collateral for the benefit of the borrower are unjustified.[7] The bankruptcy judge and BAP therefore erred in holding that because the SBA reasonably believed Top Pac needed the line of credit to survive, the unconsented switch in lien priorities was justified.[8]

■ The fact that Alcock was both a guarantor and a stockholder in Top Pac does not change this result. As a stockholder, he certainly had an interest in the survival of the Top Pac. As a guarantor however, he had a potentially conflicting interest: limiting his personal liability if the company defaulted. Thus, Alcock's status as a stockholder cannot alone support the legal conclusion that the switch in lien priorities was justified towards him as a guarantor. Under these circumstances, we cannot agree with the

BAP's conclusion, and we therefore hold the SBA's action was unjustified.

## WAIVER

■ The Alcock guaranty agreement authorizes the bank "without notice or demand (except as shall be required by applicable statute and cannot be waived) ... [to] take and hold security for the payment of this guaranty or the indebtedness and exchange, enforce, waive and release any such security...." The SBA failed to squarely address this issue in the oral argument or its brief.[9] Nevertheless, because the briefs are unclear, and because both the bankruptcy judge and BAP seemingly rely on Alcock's waiver as a alternative basis for their refusal to accept his section 3606 defense,[10] we will address the question.

We conclude that under existing Ninth Circuit precedent, the language in the SBA

---

7. *See, e.g., Guida v. Exchange Nat'l Bank,* 308 So.2d 148, 151–52 (Fla.Dist.Ct.App.1975) (stating the creditor was not allowed to recover from the surety on two unpaid notes after the creditor allowed the borrower to sell the collateral to pay off a third note and a debt to another party); *Hughes v. Tyler,* 485 So.2d 1026, 1030 (Miss. 1986) (holding the surety was released from his obligations after the holder of the note executed a partial release and subordination agreement for the benefit of the principal borrower); *Citizens Bank v. Lair,* 687 S.W.2d 268, 271–72 (Mo. Ct.App.1985) (concluding bank did not act in good faith towards the guarantor when applying proceeds of collateral to borrower's previous loans which were not guaranteed by guarantor); *Beneficial Fin. Co. v. Marshall,* 551 P.2d 315, 320 (Okla.Ct.App.1976) (finding the secured creditor unjustifiably impaired the collateral by authorizing the principal borrower to sell the collateral without the surety's consent).

8. Contrary to the BAP's suggestion, the fact that the purpose of the SBA is to help small businesses does not affect this analysis. Regardless of the SBA's mission or motives, its impairment of the collateral must be evaluated in terms of whether it is justified as towards the guarantor, not towards the borrower.

9. When asked in oral argument whether this waiver in the guaranty is a factor, counsel for the SBA failed to confirm whether it is relevant for purposes of Alcock's section 3606 defense. In the SBA's discussion of section 3606 in its brief, it never mentions the language in the guaranty agreement or whether this language waived Alcock's defense. The SBA's reference to the impairment occurring prior to default and its dis-

cussion of *Sumitoma Bank v. Iwasaki,* 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968), may be aimed at confronting the waiver issue. If so, however, this purpose is at best unclear, and the analysis is cursory. The SBA does state in the conclusion of its brief that its activities were "consented to via the guaranty agreements." Such a short, conclusory statement in the SBA's closing remarks cannot alone constitute a viable argument on appeal.

10. The bankruptcy judge stated:

Additionally, the subordination occurred prior to default. The case of *Great Southwest Life Ins. Co. v. Frazier,* (9th Cir.1988) 860 F.2d 896, relied upon heavily by the plaintiffs is distinguishable in this regard. In *Frazier* the impairment occurred after default by the borrowers. By signing the guaranty, Mr. Alcock gave the bank and the SBA the right to substitute, exchange, or release all or any part of the collateral. No case has been cited in which a waiver of pre-default impairment was found to be ineffective.

*Alcock v. United States Small Business. Admin.,* No. 986–00522, slip op. at 7 (Bankr.N.D.Cal. June 1, 1991). The BAP interpreted this reasoning as follows:

Finally, Alcock maintains that the bankruptcy court incorrectly distinguished [*Frazier*]. The court distinguished the case because in *Frazier,* unlike the case at bar, the alleged impairment occurred *after* default and thus needed an additional signed waiver after default according to the provisions of California Commercial Code § 9504(3).

*Alcock,* 157 B.R. at 27 (citation omitted).

guaranty agreement does not operate to waive Alcock's impairment-of-collateral defense under section 3606. In *Southwest Life Ins. Co. v. Frazier,* 860 F.2d 896, 903 (9th Cir.1988), this Court adopted Idaho's parallel impairment-of-collateral defense, Idaho Code § 28–3–606, as federal law for SBA loans, and then held that contract provisions that waive this defense are not binding.[11] *See also United States v. Pastos,* 781 F.2d 747, 752 (9th Cir.1986) (adopting a state commercial-law defense as federal common law while refusing to recognize an express contractual waiver of this defense); *United States v. Crain,* 589 F.2d 996, 999 n. 2 (9th Cir.1979) (same). Relying heavily on *Pastos* and *Crain,* the *Frazier* court reasoned that in cases involving SBA transactions, the balance between federal and state interests support the adoption of state U.C.C. defenses as federal common law even though the loan or contract contains an express waiver of such defenses. 860 F.2d at 903 (quoting *Pastos,* 781 F.2d at 752). The court refused to recognize the waiver provisions because contract terms should not determine the relevant federal rule of law, and because the provisions were part of the non-negotiated "boilerplate" language in the standard SBA loan form. *Id.; see also Pastos,* 781 F.2d at 752 (emphasizing the waiver in that case was not individually negotiated); *Crain,* 589 F.2d at 999 n. 2 (stating contractual provisions "do not rise to the force of federal law"). *Frazier's* analysis is clearly applicable to our case, which involves the same U.C.C. defense and a non-negotiated, boilerplate waiver provision in the Crocker guaranty form that supports the SBA's claim for a deficiency.

■ The bankruptcy judge distinguished *Frazier* because the impairment in that case occurred after default. We reject this distinction: Nothing in *Frazier's* analysis indicates its holding is limited to post-default impairments, and we find no basis for impos-

ing such a limitation. The BAP agreed with the bankruptcy judge's pre- and post-default distinction, stating that because the alleged impairment in *Frazier* occurred after default, an additional signed waiver was needed in that case under California Comm.Code § 9504(3). *See* note 10, *supra.* The BAP's analysis of *Frazier* is obviously erroneous, however, because *Frazier* involved the application of Idaho's parallel provision to section 3606 and had nothing to do with California's section 9504(3). *See Frazier,* 860 F.2d at 902–03. Thus, we hold *Frazier* is controlling in our case and conclude the waiver in Alcock's guaranty agreement is not binding for purposes of his section 3606 defense.

## DISCHARGE OF SURETY

■ We next address the question of whether Alcock is fully discharged from liability as the guarantor. Section 3606(1)(b) states that a guarantor is discharged "to the extent that ... the holder ... [u]njustifiably impairs any collateral...." A clear majority of state courts place the burden on the guarantor to prove actual prejudice and limit the discharge to the extent of impairment demonstrated. *See, e.g., Van Balen v. Peoples Bank & Trust Co.,* 3 Ark.App. 243, 626 S.W.2d 205, 210 (1982); *McHenry State Bank v. Y & A Trucking, Inc.,* 117 Ill.App.3d 629, 73 Ill.Dec. 485, 489, 454 N.E.2d 345, 349 (1983); *Huey v. Port Gibson Bank,* 390 So.2d 1005, 1009–10 (Miss.1980); *Langeveld,* 376 A.2d at 937; *Provident Bank v. Gast,* 11 O.O.3d 284, 57 Ohio St.2d 102, 109–11, 386 N.E.2d 1357, 1361 (1979); *Bissonnette v. Wylie,* 654 A.2d 333, 336–37 (Vt.1994). A number of courts qualify this rule, however, and deem complete discharge appropriate when substantial prejudice is apparent but the specific amount of impairment is speculative or difficult to measure. *See, e.g., Womack v. First State Bank,* 21 Ark.App. 33, 728 S.W.2d

---

**11.** In a footnote in *United States v. Grayson,* 879 F.2d 620, 624 N.5 (9th Cir.1989), this Court found that a party had waived its impairment defenses under Cal.Civil Code § 2819 by granting the Economic Development Agency "full power to deal in any manner with the liabilities or the collateral," as stated in the guaranty agreement. Relying on *Grayson,* both the bankruptcy judge and BAP therefore found Alcock's

section 2819 defense waived. Alcock does not challenge this conclusion on appeal. Neither the bankruptcy judge nor the BAP applied *Grayson's* reasoning to Alcock's section 3606 claim, however, and the SBA does not do so in its brief. In any event, we find *Frazier* is the controlling precedent for purposes of section 3606 and therefore conclude *Grayson's* analysis is inapplicable to the issue before us.

194, 201 (1987); *Langeveld,* 376 A.2d at 937; *Katsoufris v. Adamo,* 216 N.J.Super. 84, 522 A.2d 1046, 1048 (App.Div.1987). In *Langeveld,* the New Jersey Supreme Court summed up this approach:

> If the impairment of collateral can be measured in monetary terms, then the calculated amount of the impairment will ordinarily measure the extent of the surety's discharge. But there are factual situations ... where a surety may be able to establish that he has sustained prejudice, but be unable to measure the extent of the prejudice in terms of monetary loss. Where such a situation is presented the surety will normally be completely discharged.

376 A.2d at 937.

Typically, cases involving the impairment of collateral fall within the "calculable prejudice" category because the fair market value of released or destroyed collateral, or the diminished value of damaged collateral, can be measured at the time of impairment to determine the level of discharge. *See, e.g., Huey,* 390 So.2d at 1010 (quoting *Benders U.C.C. Service,* Hart & Willier, *Commercial Paper* section 13.24(4) (1976); *Langeveld,* 376 A.2d at 937 n. 5. In this case, however, although it is clear that the switch in the lien priority caused Alcock substantial prejudice, its effect was not immediately ascertainable; the packing plant was not immediately released, damaged, or sold. Rather, the impact of the switch was not felt until several years later, when the land and equipment were sold separately instead of as a single "going concern." The temporal division between the SBA's unjustified action and the ultimate separation of the land from the equipment makes calculating the extent of the impairment highly speculative. First, to make such a determination, the bankruptcy judge could not merely hypothesize the fair market value ("FMV") of the land and equipment, as distinct and independent pieces of property at the time of the switch, and subtract this sum from the FMV of the packing plant as a going concern. This difference would not accurately reflect the precise prejudice suffered by Alcock over two years later when the collateral was ultimately sold off to pay the debt after foreclosure. In addition, determining the probable sale price of the packing plant as a going concern at an auction following foreclosure also would be highly speculative since this figure could differ from the FMV and no actual offers for the whole plant were tendered. We therefore find both approaches would be based on pure conjecture at this late date,[12] and neither would lead to an accurate measurement of the extent of Alcock's loss.

Thus, we conclude that this case is one in which there is "clear prejudice without precisely calculable loss."[13] *Langeveld,* 376 A.2d at 937. We therefore hold Alcock is completely discharged from his obligations to the SBA. The judgment of the BAP is reversed and the case is remanded to the bankruptcy court with directions the debtor be discharged as guarantor on the Crocker/SBA loan.

REVERSED and REMANDED.

It is so ordered.

---

**12.** As discussed in note 5, *supra,* the bankruptcy judge never reached the issue of the extent of the impairment.

**13.** Although we believe a precise measurement is not possible, we find the evidence in the record clearly supports a conclusion that the impairment was substantial. At the time the loans were made and the switch in lien priority occurred, the value of the packing plant was close to a million dollars: the real estate was appraised at $320,000 and the equipment was valued at over $600,000. Less than two years later, the land and equipment were sold separately for $130,000 and $94,000 respectively. As we stated above, the appraised value of the packing plan at the time of the SBA's unjustified action is not directly comparable to the sale prices, because of the temporal and circumstantial distance between the events. Nevertheless, these figures clearly support Alcock's claim that the switch in priority greatly reduced the value of the packing plant property, perhaps to a greater extent than Alcock's total exposure.