### UNITED PACIFIC INSURANCE COMPANY, Plaintiff,

v.

### UNITED STATES DEPARTMENT OF THE INTERIOR, Minerals Management Service, Defendant.

### No. CV 98–2817 RAP (CWx).

United States District Court, C.D. California.

Sept. 20, 1999.

---

Philip S. Warden, John S. Wesolowski, Pillsbury Madison & Sutro, LLP, San Francisco, CA, Jason R. Erb, Pillsbury Madison & Sutro, LLP, Los Angeles, CA, for plaintiffs.

Alejandro N. Mayorkas, Leon Weidman, Kurt Ramlo, United States Attorney's Office, Los Angeles, CA, for defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PAEZ, District Judge.

### I.

### *Introduction*

Plaintiff United Pacific Insurance Company ("UPIC") has filed this action seek-

ing declaratory and injunctive relief against defendant United States Department of the Interior, Minerals Management Service ("MMS"). The action concerns certain payments demanded from UPIC by MMS, stemming from a bond ("Bond 83006" or "the Bond") issued by UPIC on behalf of Powerine Oil Company ("Powerine"). Plaintiff UPIC seeks a declaration from this Court that it is exonerated from its obligations as surety on the 83006 Bond. Defendant MMS has asserted a counterclaim seeking indemnification for the $850,000 payment that it made to Powerine pursuant to a Settlement Agreement in a bankruptcy proceeding.

The Court previously considered cross-motions for summary judgment in this case on November 2, 1998. The Court found that the current action was not barred on grounds of res judicata, nor by the applicable statute of limitations or principles of laches. The Court also found that UPIC was not exonerated from its obligations because the Settlement Agreement did not change the underlying obligations at issue. However, the Court denied defendant MMS's motion for summary judgment, finding that plaintiff had raised a triable issue of fact as to the amount of plaintiff's liability respecting the sum in the Settlement Agreement and that the factual record was not sufficient to make a final determination of the amount at that time.

Pending before the Court are the parties' second cross-motions for summary judgment. Also pending before the Court is defendant MMS's Motion for Leave to file a First Amended Counterclaim.

## II.

### *Discussion*

### A. Factual Background

Plaintiff UPIC is an authorized issuer of bonds for contractors doing business with the United States. On or about February 25, 1983, UPIC issued Bond No. U–43–51–57 (the "83006 Bond") as well as Bond. No.

U–43–51–56 (Contract No. 14–08–0001–18615, later amended to 14–08–0001–18316) ("the 18316 Bond") on behalf of Powerine Oil Company ("Powerine") as principal and MMS as obligee. Both bonds were issued to ensure payment on contracts for the purchase of royalty oil by Powerine, made pursuant to the Federal Royalty in Kind oil purchase program ("the Contract").

On March 26, 1984, Powerine filed for bankruptcy. The Committee of Creditors Holding Unsecured Claims in the Powerine Bankruptcy ("Powerine Creditors" or "Committee") commenced an Adversary Proceeding against MMS seeking the return of preferential transfers made to MMS during the 90–day bankruptcy preference period in the amount of $6,440,-767.98 (plus interest thereon) ("Adversary Proceeding"). On or about March 26, 1986, MMS filed a First Amended Answer in the Adversary Proceeding in which it asserted that UPIC was an indispensable party and asked the Bankruptcy Court to enter an order requiring the Committee to seek funds from UPIC. MMS also argued that the complaint should be dismissed for failure to join an indispensable party. However, UPIC was never properly served in the proceedings, although it did receive copies of the Adversary Proceeding complaint and Amended Answer in November of 1992 pursuant to its own request. In addition, the Bankruptcy Court never ruled on MMS's request.

In October of 1994, MMS and the Committee began exploring settlement options. The Adversary Proceeding was resolved in 1997; by the terms of the Settlement Agreement, MMS returned $850,000 in preference payments to the Powerine estate. (Pl.'s Req.Jud. Notice Ex. 1 at 69.) The Bankruptcy Court then dismissed the proceedings with prejudice. After MMS made demand upon UPIC for the $850,000, plaintiff UPIC filed this action.

### B. Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In assessing whether the non-moving party has raised a genuine issue, its evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.*

at 252, 106 S.Ct. 2505. As the Supreme Court explained in *Matsushita*,

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus.*, 475 U.S. at 586–87, 106 S.Ct. 1348.

### C. Application

### 1. Exoneration

Plaintiff UPIC again argues that it should be exonerated from any obligation on the Bond because the Settlement Agreement resolved obligations other than those arising from the 83006 Bond. (UPIC Mem. P. & A.'s at 1 ("the inclusion of the DOE [Department of Energy] claim and other, non-bonded obligations has modified the obligation underlying United Pacific's bond").) MMS responds that, to the extent that the Settlement Agreement resolved any other obligations between Powerine and MMS (which MMS also contends is not the case), such an argument only goes to the amount of indemnity owed on the bond, and does not eliminate UPIC's obligation.

■ Under principles of surety law, where the underlying obligation is altered, the surety is exonerated from its obligation. *See, e.g., ITT Diversified Credit Corp. v. Highlands Ins. Co.*, 191 Cal. App.3d 301, 308, 236 Cal.Rptr. 433 (1987) (citing *Southern Cal. First Nat. Bank v. Olsen*, 41 Cal.App.3d 234, 241, 116 Cal. Rptr. 4 (1974) (a court should take as its starting point the principle that " 'a surety cannot be held beyond the express terms of his contract' ")). UPIC claims it should be exonerated because the inclusion of the DOE claim in the settlement and/or the presence of other bonded obligations in the amount included in the Settlement Agree-

ment served to modify UPIC's underlying obligation. UPIC argues again that under California Civil Code section 2819, it is exonerated from performance under the Bond. Pursuant to this section, "[a] surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended." Cal.Civ. Code § 2819 (1998).

Plaintiff relies heavily upon *Miller v. Stewart*, 22 U.S. 680, 9 Wheat. 680, 701, 6 L.Ed. 189 (1824), in which the Supreme Court considered the liability of a surety that had issued a bond to secure the performance of a deputy tax collector to remit the taxes from eight townships. The deputy's obligation was later modified to nine townships; the Court found that such modification exonerated the security.

■ There has been no such change in the underlying obligation here. The Settlement Agreement merely governed the return of certain preference payments made to MMS by Powerine within the ninety days preceding Powerine's bankruptcy petition. The Settlement Agreement did *not* alter the obligations of Powerine on the bonded contracts; it simply addressed which preference payments were subject to the trustees' power of avoidance under 11 U.S.C. section 547, and which payments might fall within applica-

ble exemptions to the preference avoidance rule. Thus, to the extent that MMS returned payments made within the 90–day prepetition period, these were transfers that were *voided* under section 547. This is not equivalent to a modification of the underlying payment agreement.

Plaintiff UPIC also renews the argument that the inclusion of the Department of Energy claim affected the amount of payment returned by MMS to the Estate. However, the mere resolution of the DOE claim in the same agreement settling the MMS claim is not sufficient to create an inference that the first materially affected the second. Since plaintiff here bears the burden of proving exoneration, plaintiff must meet its burden by affirmative, admissible evidence. Plaintiff has failed to do so here.

Finally, under federal common law as applied by the Ninth Circuit in the context of this case, the surety must demonstrate not only material alteration in the bonded contract, but also that such alteration caused prejudice. *United States v. Reliance Ins. Co.* 799 F.2d 1382, 1385 (9th Cir.1986) ("a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent.... In addition, where, as here, a compensated surety seeks exoneration, it must show that the alteration caused prejudice or damage.")[1] Not only has plaintiff failed to demonstrate such an alteration; it also has not demonstrated prejudice.

1. As discussed below, it appears that federal common law should apply to this action. However, even California courts have stated that a mere formal change in the obligation is not sufficient for exoneration of the surety. "Rather, the proper approach is to determine whether that judgment materially modified the original obligation in a manner not contemplated by the surety." *ITT Diversified Credit Corp. v. Highlands Ins. Co.*, 191 Cal. App.3d 301, 308, 236 Cal.Rptr. 433 (1987).

In addition, even if UPIC were to argue successfully that the Settlement Agreement somehow constitutes a reduction in the amount owed by Powerine on the obligation,

this might not constitute a significant enough change to warrant exoneration under California law. As one Court of Appeal observed in *V.I.P. Agency v. Duffy Electronics, Inc.*, 92 Cal.App.3d 849, 155 Cal.Rptr. 45 (1979), reduction in the amount of debt reduces a surety's exposure but is not an alteration of the obligation and therefore is not cause for exoneration. 92 Cal.App.3d at 852–53, 155 Cal. Rptr. 45 (but finding that alteration transforming immediate obligation to pay into one enforceable only according to schedule of deferred payments constituted substantial alteration that was grounds for exoneration).

For all of the reasons given above, and in harmony with its reasoning on the first motion for summary judgment on this matter, the Court rejects plaintiff's arguments regarding exoneration. Accordingly, plaintiff's motion for summary judgment seeking a declaration that it is exonerated from its obligations under Bonded Contract 83006 as a result of the Settlement Agreement is **denied** and defendant's motion with respect to this question is **granted.**

### 2. Amount of Settlement Agreement Relating to the Bond

The Court is thus again faced with the same concerns that surfaced at the last hearing on this matter: namely, the apportionment of the $850,000 Settlement Agreement amount. Defendant MMS argues that the full $850,000 was contemplated as return of preference payments on the 83006 Bond. In the alternative, it seeks to add an amended counterclaim against UPIC for any amount due it under Bond No. 18316.

The Adversary Proceeding concerned four contracts between MMS and Powerine: Contracts Nos. 18316, 83006, 84133, and 84229. Contracts 83006 and 84229 were related to on-shore oil leases, whereas contracts 18316 and 84133 pertained to off-shore oil leases.

Under 11 U.S.C. former § 547(c)(2)(b) (1984), payments made by Powerine within the last 90 days prior to filing its bankruptcy petition which were not made within the ordinary course of business and where payment did not fall within 45 days of delivery were considered preference payments. During the ninety days prior to Powerine's March 26, 1984 bankruptcy petition, Powerine made $6,440,767.98 in contract payments to MMS. The Committee believed that $2,790,920.23 of this amount constituted preferential payments under contracts 83006, 18316, and 84133. (Gould Decl.Ex. C at 48). A Bankruptcy Court order settled the question of outstanding payments on contracts 84229 and 84133. (Prouhet 2d Supp.Decl., Ex. 19 (Bankruptcy Court Order filed May 29, 1984, entered June 5, 1984).) Thus, these two contracts were no longer part of the adversary proceeding and were not a part of the 1997 Settlement Agreement.

MMS claims that the Bankruptcy Court entered an order resolving claims arising from Contract No. 18316, which was also bonded by UPIC. The Bankruptcy Court's May 8, 1985 order states that MMS would pay to Powerine Oil the sum of $60,000 and "Payment of said sum shall be in full and complete settlement of all claims, demands and causes of action asserted in this action, and all claims, demands and causes of action which could have been asserted by plaintiff against defendants relating to sales of United States government royalty crude oil by defendants to plaintiff prior to January 2, 1984." (Prouhet 2d Supp. Decl.Ex. 16 (Bankruptcy Court Order, May 25, 1984).) [2]

Contract No. 18316 commenced on August 1, 1980, and terminated on January 1, 1984. Although there were payments made after that date, there were no further deliveries. (2d Supp. Prouhet Decl. ¶ 22; Prouhet Decl.Ex. 9; Ex. 13, at 83.) Therefore, the Bankruptcy Court's May 1985 Order appears to have settled the claims pertaining to Contract No. 18316.[3] The only remaining claims between MMS and Powerine thus would have been the outstanding unpaid amounts on the 83006

**2.** The Bankruptcy Court order also settled claims arising from eight other contracts for the purchase of government Royalty Oil between MMS and Powerine.

**3.** Indeed, to find otherwise would make little sense. Although the parties have not raised the issue of the proper interpretation of the Stipulation for Settlement's phrase "sales of United States government royalty crude oil ... prior to January 2, 1984," since the only payments at issue were those within the preference period window, the Court does not see what other payments could have been meant.

Contract, for which MMS now seeks indemnification from UPIC.

Even assuming, arguendo, that the May 1985 Order did not dispose of all of plaintiff's claims under the 18316 Contract, defendant may still allocate the total $850,000 Settlement Amount which it paid to the Trustees as a return of payments made under the 83006 contract.

■ Under general principles of suretyship law, it is at the principal's discretion to determine which obligations to a creditor it may meet. When a principal provides partial satisfaction of an obligation, and a surety is liable only upon a portion of that obligation, the principal may designate the portion of the obligation that is to be satisfied. *See, e.g., United States v. New Hampshire Fire Ins. Co.,* 173 F.Supp. 529, 538 (E.D.N.Y.1959) ("the general rule as to the application of payments is that the right belongs, in the first instance, to the debtor. In the absence of a direction from the debtor the right belongs to the creditor to apply a payment to any debt which the debtor may owe him, even though a surety is bound on one of the debts involved."); Cal.Civil Code § 2822 (1999); *Brunswick Corp. v. Hays,* 16 Cal. App.3d 134, 139, 93 Cal.Rptr. 635 (1971) (citing California case law indicating that obligor may direct proceeds of involuntary performance to cover portion of obligation not covered by the guarantor's security). Here, defendant MMS is *not* the principal obligor, but rather the obligee. However, the same principles of suretyship still govern: namely, UPIC, as guarantor and thus a non-party to the partial resolution of the obligation, cannot dictate how the funds should be apportioned among the obligations at issue. MMS and the Trustees have discretion as to how any return of payments may be allocated among the obligations between them in the Settlement Agreement.

■ In sum, because the only remaining claims to be settled in the 1997 Settlement Agreement related to the 83006 Contract,

MMS's motion for summary judgment is **granted.** In addition, despite the silence of the Settlement Agreement regarding apportionment, even if the Settlement Agreement concerned payments under multiple obligations existing between Powerine and MMS, MMS had discretion to apportion the return of such payments as it saw fit. Accordingly, UPIC's motion for summary judgment on this issue is **denied** and defendant MMS' motion is **granted.**

### 3. Filing of a Claim

UPIC also argues that, by failing to file a timely bankruptcy claim after the Settlement Agreement was entered, MMS has compromised its rights. MMS responds that: (1) the mere fact that MMS failed to present a claim against the principal's bankruptcy estate does not discharge a surety; and (2) MMS can be deemed to have filed an informal claim by virtue of the Bankruptcy Settlement Agreement, and that it later perfected that claim through formal filing.

The original claim bar date set by the Bankruptcy Court was March 1, 1985. However, the Bankruptcy Court Judgment dismissing the Adversary Proceeding was entered on August 18, 1997. MMS did not file a Proof of Claim for the $850,000 settlement payment until January 21, 1998, well over five months later.

Federal Rule of Bankruptcy Procedure Rule 3003(c)(3) references Fed.R.Bankr.P. 3002(c)(3), which provides that:

> An unsecured claim which arises in favor of an entity or becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment is for the recovery of money or property from that entity or denies or avoids the entity's interest in property.

Fed.R.Bankr.P. 3002(c)(3). MMS does not dispute that the entry of the Settlement Agreement here constituted just such a judgment. MMS argues that it specifically retained the right to file a proof of claim

against the Powerine Bankruptcy Estate in the Settlement Agreement and that the February 2, 1995 settlement offer and the Settlement Agreement filed in the Bankruptcy Court on June 20, 1997 are sufficient to constitute informal filing.

The Court is not convinced by this argument. First, mere reservation of a right to file a claim does not constitute actual filing. According to the Ninth Circuit, "[f]or a document to constitute an informal proof of claim, it must state an explicit demand showing the nature and amount of the claim against the estate, and evidence an intent to hold the debtor liable." *Wright v. Holm*, 931 F.2d 620 (9th Cir. 1991). MMS here has pointed to no specific document or demand made either to the bankruptcy court or to the Estate that might serve as an informal proof of claim. Although the ongoing Adversary Proceeding certainly alerted all parties of the size of the payment returned to the Estate, MMS has not evidenced the requisite intent to hold the debtor liable. Therefore the Court rejects MMS's argument that it filed an informal proof of claim.

MMS is correct that no party in interest has yet filed an objection to its claim as permitted under 11 U.S.C. section 502(a). However, it is unnecessary for an objection to have been filed in order for there to be an impairment of interest. Under 11 U.S.C. section 726(a)(2)(C), distributions of estate property first go to payment of claims of the kind specified in section 507 of the Bankruptcy Code, next to payment of allowed unsecured claims that are timely filed,[4] and only later to payment of untimely unsecured claims. Thus, by failing to file a proper notice of claim, although MMS did not wholly abandon its

rights in the Estate, it did compromise those rights.

### 4. Consequences of the Impairment of Rights

Depending upon the applicable law, MMS's failure to file a timely claim may result in either a complete elimination or reduction of its ability to recover from the Estate. Under California law, a surety is discharged from its obligation where a preference settlement modifies the underlying contract *or* where a late-filed claim impairs the surety's remedies against the principal. Cal.Civ.Code § 2819 (1999). This is the traditional rule known as *strictissimi juris* —impairment results in exoneration.[5] By contrast, some federal courts, where the United States is a party, have applied a federal common law rule, under which the impairment resulting from MMS's late filing of a claim at most entitles UPIC to a pro tanto discharge equal to its loss—i.e., the actual value of the alleged defective claim.

Thus the Court must determine whether, when a United States federal program or agency, as creditor to a debtor in bankruptcy proceedings, fails to file a timely claim under 11 U.S.C. section 726 and thereby impairs its subrogation rights, the surety on the obligation between the debtor and the creditor should be completely exonerated from its obligation, or should be exonerated only pro tanto.

In *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court considered whether contractual liens arising from federal loan programs should take precedence over private liens, where there was no

---

4. Tardily filed claims may also be ranked concomitantly with timely filed claims, but only where the creditor holding the claim did not have notice or actual knowledge of the case in time for timely filing of proof of such claim. 11 U.S.C. § 726(a)(2)(C)(i), (ii) (1998). Having litigated this case in bankruptcy court for over ten years, MMS can hardly make that argument.

5. Note that although arguably there may be no *actual* detriment to a creditor's rights, say, where there is nothing left in the Estate, or where there are no timely filed claims by other unsecured creditors, the language of section 2819 makes exoneration contingent upon the impairment of "remedies or rights," and not upon actual injury. Cal.Civ.Code § 2819 (1998).

federal statute establishing priorities. *Kimbell Foods*, 440 U.S. at 718, 99 S.Ct. 1448. The Supreme Court emphasized that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." *Id.* at 726, 99 S.Ct. 1448. It further observed that, "[w]hen Government activities 'aris[e] from and bea[r] heavily upon a federal ... program,' the Constitution and Acts of Congress 'require otherwise than that state law govern of its own force.'" *Id.* at 727, 99 S.Ct. 1448 (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592, 593, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973)). *But cf. United States v. Yazell*, 382 U.S. 341, 348–49, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966) (holding unless there is an overriding federal interest in uniformity, applicable state law provides the rule of decision).

■ Simply because a controversy involves the operation of a federal program does not mean that courts should automatically resort to federal rules of decision. In determining whether to adopt state law or to fashion a nationwide federal rule, the courts must weigh: (1) whether the federal program is one that by its nature is and must be uniform in character throughout the nation; (2) whether application of state law would frustrate specific objectives of the federal programs; and (3) the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Id.* at 728–29, 86 S.Ct. 500.

In *Kimbell Foods* the Supreme Court found that local state law should govern. The Court based its conclusion upon a few central observations: (1) agency employees were instructed by the Small Business Administration (SBA) manuals to follow state law carefully; (2) applicable SBA regulations suggested that state rules were to determine the priority of FHA liens when federal statues or agency regulations were not controlling; (3) the agencies in question already conformed to individual state commercial standards and operated through local lending offices and employees who were familiar with the law of their respective localities; (4) allowing federal contractual liens automatic superiority would undermine local businessmen who would have their expectations destabilized whenever a federal contractual security suddenly appeared. *Id.* at 730–39, 99 S.Ct. 1448.

■ Although the parties have not addressed this question at length, the factors favoring application of state law in *Kimbell Foods* are not present here. First, although there is a federal program mandate that those parties contracting with MMS must obtain surety guarantees, it does not appear that MMS is directed by federal laws or regulations to look to local state law in entering suretyship obligations. Also, unlike the Small Business Administration or the Farmers Home Administration, MMS contracts on a larger national scale and is unlikely to be familiar with the local law of suretyship of every jurisdiction where a controversy might arise. Finally, the Court is also mindful of the effects of strict implementation of California law on the public fisc. Were the Court to adhere to a strict rule of complete exoneration under California Civil Code section 2819, the federal government would find itself completely deprived of the financial protection which it *required* in the establishment of this federal program.

The Ninth Circuit has previously adopted a federal common law approach to surety obligations where the federal government is involved. In *United States v. Reliance Insurance Co.*, the Ninth Circuit observed that, since the action in question was brought under 28 U.S.C. § 1345, a strict application of *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) was not mandated. However, the Ninth Circuit also observed that there was no clear body of federal common law to apply with regard to modifications of an underlying bonded contract and such modifications' effect on the surety. *U.S. v. Reliance Ins. Co.*, 799 F.2d 1382, 1385 (9th

Cir.1986). Therefore the Ninth Circuit, observing that there was no "significant conflict" between federal and state law, would look to state substantive law for guidance. *Id.* The court then went on to examine California Civil Code section 2819 as well as general principles of suretyship as set forth in treatises and the law of other circuits. *Cf. United States v. California,* 655 F.2d 914 (9th Cir.1980) (applying California statutory requirements where cause of action involved fire upon California land and application would further state's proprietary interests but not frustrate any federal policy or program; in addition, there was no need for a uniform federal rule).

Given the factors set forth in *Kimbell Foods,* the Court is not bound strictly by California law. However, at the same time, since there is no clear federal common law in this arena, the Court will be guided by principles of suretyship as set forth in the laws of the several states.

The Federal Circuit recently considered a case involving the government's relation with a surety that provides a helpful analogy, *National Surety Corp. v. United States,* 118 F.3d 1542 (Fed.Cir.1997). In *National Surety,* the government failed to withhold a ten percent retainage as required by contract. The primary contractor abandoned the project and the surety (National Surety Corp.) completed the construction in accordance with its performance bond. National Security was paid the difference between the contract price and the payments already made; it then filed a claim for the retainage funds that had been wrongly discharged by the government to the primary contractor. *Id.* at 1544. The contracting officer failed to act in a timely manner on the claim.

The Court determined that the government had injured the surety and therefore the surety should be compensated; however, it reversed the Court of Federal Claims

finding that the surety was entitled to the full amount of the required retainage. The court observed that:

> Courts and commentators have recognized the difficulties in measuring [actual damages attributable to the compromise of the obligee's rights, here, the release of the retainage], and perhaps for this reason there are significant differences among the states and even within states in the extent to which changes in a bonded contract have been held to release the surety or, variously, provide a partial discharge. The trend, particularly for compensated commercial (as compared with personal) sureties, is in the direction of pro tanto discharge measured as set forth in the Restatement (Third) § 42 (Impairment of Collateral):
>
> > (1) If the underlying obligation is secured by a security interest in collateral and the obligee impairs the value of that interest, the secondary obligation is discharged to the extent that such impairment would otherwise increase the difference between the maximum amount recoverable by the secondary obligor pursuant to its subrogation rights (§§ 27–31) and the value of the secondary obligor's interest in the collateral.

*Id.* The Federal Circuit thus concluded that the surety's recovery should not exceed any losses that ensued from the impairment of the security.

The Ninth Circuit has taken a similar approach where nonconsenting sureties believe that the lenders' actions have prejudiced them by reducing the value of the underlying collateral. In *In re Alcock,* 50 F.3d 1456 (9th Cir.1995), the Ninth Circuit relied upon section 3606 of the California Commercial Code in determining the scope of a guarantor's defense against a Small Business Administration's deficiency claim on a note.[6]

---

**6.** Note, however, that this reliance upon California state law is not a contrary result to that

reached by the Court in the *Kimbell Foods* analysis conducted previously. First, the

Although the Federal Circuit's reasoning in *National Surety* depended upon its observations respecting the intersection of surety and collateral, the same principles should apply here. The Court acknowledges that this pro tanto approach is in direct contradiction to the approach embodied in California law. The Court, however, is persuaded that the reasoning advanced by the Federal Circuit and adopted by the Ninth Circuit in the context of impaired collateral and its effects on an underlying surety obligation should also be applied to those situations where a creditor impairs its recourse against a bankruptcy estate. *See also Transamerica Ins. Co. v. City of Kennewick*, 785 F.2d 660 (9th Cir.1986) (applying Restatement (First) of Security section 132, where Washington surety law had adopted such section); Restatement (First) of Security § 132 (1941 and 1998 pocket part).[7] Accordingly, to the extent that MMS's failure to timely perfect a claim resulted in a decreased recovery from the Powerine Bankruptcy Estate, MMS's obligation as surety must be reduced by the same amount. Likewise, any obligation that UPIC has to MMS will be offset by any recovery on its claim that MMS obtains from the Estate itself. This result is very similar to the one achieved by the Federal Circuit's opinion in *National Surety:*

UPIC will be relieved of its obligation to the extent that MMS's actions increased its risk, but it will not be completely absolved of its surety obligation. Likewise, if there was no actual injury to UPIC—i.e., MMS's failure to file a timely claim made absolutely no difference in the amount it could recover from the Estate—then UPIC's full obligation will remain intact.

The Court emphasizes, however, that its holding today does not absolve government agencies of their responsibility to file timely claims with a bankruptcy estate. To the extent that the surety's remedies have been impaired or its risk or exposure has been increased, the surety's obligation should be diminished accordingly. To the extent that the creditor's inaction caused the impairment of its rights to the detriment of the surety, the creditor's possible recovery will accordingly be diminished.

MMS failed to file a timely claim and therefore has impaired its rights in the Estate. UPIC is thus exonerated from a portion of its obligation, but only to the extent that UPIC suffers actual injury from such failure.

It is not possible at this time to determine the exact value of MMS's late filed claim or the value of the impairment to MMS's claim by virtue of its delay.[8] How-

---

Court in *Kimbell Foods,* recognized that the SBA is the type of federal agency that may be in a particularly good position to comply with local state law without impairing its mission or function. However, setting that point aside, the Ninth Circuit in *In re Alcock* specifically observed that the California Commercial Code section at issue was taken directly from the Uniform Commercial Code and therefore is considered as federal common law. *In re Alcock,* 50 F.3d at 1460 n. 3. *See also Great Southwest Life Ins. Co. v. Frazier,* 860 F.2d 896, 899–900 (9th Cir.1988) (employing Idaho impairment of collateral statute as a federal rule for SBA loan transactions where Idaho statute was identical to U.C.C. § 3–606).

7. Where the creditor has security from the principal and knows of the surety's obligation, the surety's obligation is reduced pro tanto if the creditor

  (a) surrenders or releases the security, or

(b) wilfully or negligently harms it, or

(c) fails to take reasonable action to preserve its value at a time when the surety does not have an opportunity to take such action.

Rest. (1st) Security § 132 (1941 Main Vol. & 1998 pocket part).

8. Although MMS has argued that the full value of the claim is at best $17,000 (Def.'s Mem.Opp. at 17), this does not determine the extent to which the $850,000 is to be offset. Rather, a pro tanto reduction diminishes the amount of UPIC's obligation to the extent of the *impairment* of rights that resulted from MMS's conduct. If MMS's late filing has resulted in a loss of the total value of the claim and the value of such a claim *timely filed* would have been $17,000, then this is the appropriate amount of reduction of MMS's recovery. If, however, the amount recovered by MMS at the conclusion of the bankruptcy

ever, in order to bring finality to this dispute, the Court will enter judgment in favor of defendant, allowing them to recover $850,000 minus the final amount of MMS's recovery from the Bankruptcy Estate as well as the value of the claim that was impaired by MMS's untimely filing.

### D. Motion to File an Amended Counterclaim

Because the Court has determined that MMS may assert a claim against UPIC for the full $850,000 on the 83006 Bond, defendant's motion to file an amended counterclaim is **denied as moot.** However, the Court observes that were this not the case, the substantial delay that has elapsed prior to the filing of this proposed counterclaim would counsel against granting leave to amend.

### III.

### *Conclusion*

Accordingly, for the reasons given above, MMS's motion for summary judgment is **granted** and UPIC's is **denied.** The Court has determined that plaintiff UPIC is not exonerated from its obligation as surety on the 83006 Bond because the 1997 Settlement Agreement did not alter the terms of UPIC's obligation. The Court thus declares that UPIC is liable on payments returned as set forth in the Settlement Agreement. However, since MMS failed to file a timely claim, the amount of MMS's recovery must be reduced pro tanto in order to reflect the amount of impairment to UPIC's interest. Therefore, MMS shall recover of UPIC the full amount of $850,000 minus both the amount of injury caused by MMS's impairment of the claim *and* the eventual amount of claim recovery. The Court will retain jurisdiction to enforce or modify the terms of the

proceedings is $17,000, and MMS's recovery would have been greater had it timely filed, UPIC is entitled to have the $850,000 award reduced by the greater amount. Of course, a

judgment if needed. Judgment shall be entered forthwith.

**IT IS SO ORDERED.**

final determination of these sums cannot be made until the bankruptcy proceedings are concluded.